MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
Asa W. Markel (Bar No. 263029)
amarkel@masudafunai.com
19191 South Vermont Avenue, Suite 420
Torrance, CA  90502
Telephone:  (310) 630-5900
Facsimile:  (310) 630-5909

Attorneys for Plaintiff Roadget Business Pte. Ltd.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Roadget Business Pte. Ltd., | ) Case No: 3:23-mc-80176 |
| Plaintiff, | ) |
| vs. | ) **ROADGET BUSINESS PTE. LTD.'S** |
| | ) **MOTION TO COMPEL TWITTER, INC.'S** |
| Twitter, Inc., | ) **COMPLIANCE WITH SUBPOENA** |
| Defendant. | ) Judge: |
| | ) Date: |
| | ) Time: |
| | ) Courtroom: |

1

**TABLE OF CONTENTS**

2   STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

3   I.      INTRODUCTION ................................................................................................ 1

4   II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ........................... 3

5       A.    Roadget's Claims against Temu Pending in the Northern District of Illinois. ...................... 3

6       B.    Twitter's Terms of Service and Privacy Policy. ........................................................ 5

7       C.    Roadget's Subpoena to Twitter and Twitter's Response. ............................................. 9

8   III.    ARGUMENT ...................................................................................................... 13

9       A.    Legal Standard. ........................................................................................... 13

10      B.    Twitter Does Not Object That The Responsive Documents Are Relevant. ........................ 15

11      C.    Twitter's SCA Objections Are Baseless. ............................................................ 16

12          i.    Roadget is Entitled to the Public Responsive Documents. ...................................... 16

13          ii.   Roadget is Entitled to the Private Responsive Documents under 18 U.S.C. § 2702(b)(3),

14      because Twitter Users Consented to the Disclosure by Agreeing to Twitter's Terms of Service,

15      Privacy Policy, and Rules and Policies. ...................................................................... 18

16          iii.  Roadget is Also Entitled to User Account Information and Other Record Information

17      Associated with the Responsive Documents because Roadget is Not a Governmental Entity

18      and Twitter Users Consented to the Disclosure. ............................................................ 21

19  IV.     CONCLUSION ................................................................................................... 23

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

CASES

*Brevoort v. G4S Secure Sols. (USA) Inc.*,

  2022 WL 3012529, at *3 (C.D. Cal. June 21, 2022)............................................................13, 14, 15

*Crispin v. Christian Audigier, Inc.*,

  717 F. Supp. 2d 965, 980-991 (C.D. Cal. 2010)...........................................................................17

*Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*,

  961 F. Supp. 2d 659, 668 (D.N.J. 2013).......................................................................................17

*Erickson v. Builder Advisor Grp. LLC*,

  No. 22-MC-80094-TSH, 2022 WL 1265823, at *2 (N.D. Cal. Apr. 18, 2022) .......................13, 14

*Fischer v. Forrest*,

  2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017 .......................................................................15

*Gonzales v. Uber Techs., Inc.*,

  305 F. Supp. 3d 1078, 1084 (N.D. Cal. 2018)..............................................................................21

Illinois Trademark Registration and Protection Act, formerly the Anti-Dilution Act, 765 ILCS

  1036/65 ...........................................................................................................................................5

*In re Facebook Privacy Litig.*,

  791 F. Supp. 2d 705, 714 (N.D. Cal. 2011)..................................................................................18

*In re Seagate Tech. II Sec. Litig.*,

  No. C-89-2493 (A)-VRW, 1993 WL 293008, at *1 (N.D. Cal. June 10, 1993) ...........................14

*In re Zynga Priv. Litig.*,

  750 F. 3d 1098, 1105-1107 (9th Cir. 2014)..................................................................................21

*Konop v. Hawaiian Airlines, Inc.*,

  302 F.3d 868, 875 (9th Cir. 2002) ...............................................................................................17

*Leonardo World Corp. v. Pegasus Sols., Inc.*,

  Case No. 5:15-mc-80165-PSG, 2015 WL 5610019, at *3 (N.D. Cal. Sept. 24, 2015).................22

*Louis Vuitton Malletier, S,A v. Akanoc Sols., Inc.*,

  No. C07-03952 JW (HRL), 2008 WL 2783206, at *2 (N.D. Cal. July 15, 2008) ........................17

*Music Grp. Macao Com. Offshore Ltd. v. Foote*,
   No. 14-CV-03078-JSC, 2015 WL 2170121, at *2 (N.D. Cal. May 6, 2015) .................................. 14

*Obodai v. Indeed, Inc.*
   No. 13-80027-MISC EMC (KAW), 2013 WL 1191267, at *3 (N.D. Cal. Mar. 21, 2013) ............ 21

*Raya v. Barka*,
   2022 WL 686460, at *4 (S.D. Cal. Mar. 8, 2022) ....................................................................... 13

*Roadget Business Pte. Ltd. v. Whaleco., Inc., et al.*,
   Case No. 22-cv-07119 ................................................................................................................... 1

*Schoonmaker v. City of Eureka*,
   No. 17-CV-06749-VC (RMI), 2018 WL 5829851, at *1 (N.D. Cal. Nov. 7, 2018) ............... 14, 15

*Svenson v. Google Inc.*,
   No. 13-CV-04080-BLF, 2015 WL 1503429, at *7-8 (N.D. Cal. Apr. 1, 2015) ............................ 21

STATUTES

17 U.S.C. § 101 *et seq* ......................................................................................................................... 5

18 U.S.C. § 2702(b) ............................................................................................................................ 16

18 U.S.C. § 2702(b)(1) .................................................................................................................. 16, 18

18 U.S.C. § 2702(b)(3) ......................................................................................................... 16, 17, 18, 20

18 U.S.C. § 2702(c) ............................................................................................................................ 16

18 U.S.C. § 2702(c)(6) ....................................................................................................................... 16

18 U.S.C. §§ 2702(c)(2), (6) .............................................................................................................. 21

Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.* ............................................... 10

SCA, 18 U.S.C. §§ 2701 *et seq* ......................................................................................................... 10

Section 2702(6) .................................................................................................................................. 22

Section 2702(c)(2) ............................................................................................................................. 22

Trade Act of 1946, 15 U.S.C. § 1114 .................................................................................................. 4

Trademark Act of 1946, 15 U.S.C. § 1125(a) ...................................................................................... 5

Trademark Act of 1948, 15 U.S.C. § 1125(c) ...................................................................................... 5

OTHER AUTHORITIES

H.R. Rep. No. 99-647, at 66 (1986) ............................................................................17, 19

RULES

Fed. R. Civ. P. 34(b)(2)(C)...................................................................................14, 15

Fed. R. Civ. P. 45(a)(1)(D)..........................................................................................13

Fed. R. Civ. P. 45(d)(2)(B)..........................................................................................14

Fed. R. Civ. P. 45(d)(2)(B)(i).......................................................................................14

Federal Rule of Civil Procedure 26(b) ........................................................................14

Federal Rule of Civil Procedure 45 ...............................................................................1

## NOTICE OF MOTION

PLEASE TAKE NOTICE that Roadget Business Pte. Ltd.'s ("Roadget") Motion to Compel Twitter, Inc.'s ("Twitter") Compliance with Subpoena will be heard on _____, 2023, at _____, in the United States District for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Courtroom ____.

Roadget will move the Court, pursuant to Federal Rule of Civil Procedure 45, to compel Twitter, Inc. ("Twitter") to produce materials responsive to Request Nos. 2-3 of the Subpoena to Produce Documents, Information, or Objects ("Subpoena") that was issued in connection with a case pending in the U.S. District Court for the Northern District of Illinois, *Roadget Business Pte. Ltd. v. Whaleco., Inc., et al.*, Case No. 22-cv-07119.

## STATEMENT OF ISSUES TO BE DECIDED

Should Twitter be compelled to respond to Request Nos. 2-3 of the Subpoena despite its Stored Communications Act ("SCA") objections, where several SCA exceptions apply to these requests?

## I.       INTRODUCTION

The Court should compel Twitter to produce (1) all undeleted posts made by fraudulent Twitter accounts that use the SHEIN trademarks in their account handles, including, but not limited to, @SHEIN_NYC, @SHEIN_DC, and @SHEIN_USA_ (collectively, "Imposter Twitter Accounts"), and all data relating to such posts, and (2) any undeleted direct messages sent to and from the Imposter Twitter Accounts, in response to Request Nos. 2-3 of the Subpoena (collectively, "Responsive Documents").

The Subpoena arises out of a lawsuit pending in the U.S District Court for the Northern District of Illinois, *Roadget Business Pte. Ltd. v. Whaleco., Inc., et al.*, Case No. 22-cv-07119 (the "Action").

In the Action, Roadget asserts that PDD Holdings Inc. and WhaleCo, Inc. (collectively, "Temu") have willfully infringed Roadget's exclusive and valuable trademark and copyright rights. Among other things, Roadget has alleged that Temu has impersonated Roadget's well-known SHEIN brand on social media, including Twitter, to trade off of the well-known SHEIN trademarks and to use copyrighted images owned by Roadget as part of Temu's product listings in an effort to unlawfully promote its products and services and trick consumers into buying from Temu and/or downloading its mobile application. The Responsive Documents are of central relevance to the Action because they would allow Roadget, among other things, (1) to determine whether the Imposter Twitter Accounts are associated with Temu or any other persons acting on Temu's behalf, (2) to obtain information about how these accounts were used for Temu's benefit and to Roadget's detriment, and (3) to mitigate any negative effects of Temu's wrongdoing.

Twitter refuses to produce the Responsive Documents because the SCA allegedly prohibits it from producing them. But several SCA exceptions apply here. SCA allows Twitter to produce content where, as here, Twitter provided notice to, and obtained consent from, its users to disclose such information by requiring them to agree to its Terms of Service and Privacy Policy, which expressly states that Twitter may use, share, or disclose any information reasonably necessary to comply with legal process. The SCA also allows Twitter to produce public posts and all data relating to such posts because users' publication of the posts to the general public constitutes consent and, moreover, the public, including Roadget, is the intended recipient of the posts. Twitter's SCA objections are meritless. Therefore, Roadget respectfully requests that the Court enter an Order directing Twitter to produce the Responsive Documents within fourteen days.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Roadget's Claims against Temu Pending in the Northern District of Illinois.

Roadget is the owner of the famous SHEIN trademarks in the United States and worldwide. (Declaration of Jiwon Yhee, "Yhee Decl.," attached as Ex. 1, at First Amended Complaint, "FAC," Ex. A.) Roadget's SHEIN trademarks are used to sell a wide variety of products around the world, including in the U.S. (*Id.* at ¶ 10.) In the U.S., SHEIN-branded goods and services are primarily sold by Roadget's affiliate and licensee, Shein Distribution Corporation ("SDC," and with Roadget, "Shein") through the website at https://us.shein.com ("SHEIN Website") and the corresponding mobile application ("SHEIN Mobile App"). (*Id.*) The SHEIN trademarks are now associated with one of the most popular online fashion and lifestyle retailers in the world. *Id.* SDC offers a wide range of products under the SHEIN trademarks and domain name, including apparel for women, men, and children, and everything from home goods to pet supplies. (*Id.*) The popularity of the SHEIN brand among consumers has skyrocketed in the last several years. (*Id.* at ¶ 12.)

A significant contributor to the success of the SHEIN brand has been online marketing strategies on social medial platforms and fashion blogs, appealing to consumers who prefer to shop online. (*Id.* at ¶ 11.) The SHEIN brand has partnered with thousands of influencers, celebrities, fashion bloggers, and contestants on reality shows, and has started viral trends. (*Id.* at ¶ 11.) The SHEIN brand has a significant social media presence, with over 29 million followers on Instagram, 7.1 million followers on TikTok, and nearly 625,000 followers on Twitter. (Yhee Decl., ¶ 2.) The official Twitter account for the SHEIN brand is @SHEIN_Official ("Genuine SHEIN Twitter Account").

On September 1, 2022 Temu launched its U.S. online shopping website at https://www.temu.com and the corresponding mobile application. (*Id.*, Ex. A at ¶ 24.) Like the SHEIN Website and SHEIN Mobile App, the TEMU-branded website and app provide various products for

sale, including apparel, footwear, beauty and health, home and garden, electronics, office products, and pet supplies. (*Id*.) Instead of competing fairly, Temu has deliberately engaged in unfair competition by exploiting the SHEIN brand and pretending to be SHEIN online to promote its own brand, products, and services. (*Id*. at ¶ 29.) Temu's unlawful activity includes trademark infringement, counterfeiting, copyright infringement, false advertising, unlawful business practices, with the intent to divert customers of Shein, who may be seeking SHEIN-branded goods, and deceiving them into downloading Temu's mobile app and buying products from Temu instead. (*Id*.)

One of the many ways that Temu has engaged in wrongdoing is through the Imposter Twitter Accounts. (*Id*. at ¶ 31.) Roadget has alleged that Temu (or third parties acting at Temu's direction and on its behalf) created, operated, or controlled, directly or indirectly, false, fake, and fraudulent Twitter accounts that incorporate the SHEIN trademarks and that have pretended to be SHEIN in the eyes of consumers, such as @SHEIN_NYC, @SHEIN_DC, and @SHEIN_USA_. (*Id*.) Roadget also alleges that Temu used such Imposter Twitter Accounts to falsely suggest that it is associated with the SHEIN brand or that it is the SHEIN brand by using spurious marks that are identical or substantially indistinguishable from the SHEIN trademarks ("Counterfeit SHEIN Marks"), by providing links to authentic domain names owned by Roadget, by retweeting authentic posts from the Genuine SHEIN Twitter Account, and by displaying in the profile section of the Imposter Twitter Accounts the number of followers of the Genuine SHEIN Twitter Account. (*Id*. at ¶¶ 33-36.) After luring consumers, including customers or potential customers of SHEIN, into viewing and interacting with the Imposter Twitter Accounts, those accounts made posts intended to divert consumers interested in buying from Shein or buying SHEIN-branded products to using Temu, or to divert customers into joining Temu while prominently using and displaying the Counterfeit SHEIN Marks. (*Id*. at ¶ 37.)

Based on the foregoing and other wrongdoing, Roadget filed the Action on December 16, 2022, which includes claims for: (1) trademark counterfeiting in violation of the Trade Act of 1946, 15 U.S.C. § 1114; (2) trademark infringement in violation of the Trademark Act of 1946, 15 U.S.C. § 1114; (3) the use of false designations of origin and unfair competition in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(a); (4) the use of false and misleading descriptions and representations in violation of the Trademark Act of 1946, § 1125(a); (5) contributory false advertising in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(a); (6) copyright infringement under 17 U.S.C. § 101 *et seq.*; (7) trademark dilution in violation of the Trademark Act of 1948, 15 U.S.C. § 1125(c); (8) trademark dilution under the Illinois Trademark Registration and Protection Act, formerly the Anti-Dilution Act, 765 ILCS 1036/65; (9) unfair competition in violation of Illinois common law; (10) product disparagement and trade libel under Illinois common law; and (11) unjust enrichment. (*See generally*, *id.*)  On February 3, 2023, Roadget filed a motion for a preliminary injunction against Temu, further seeking expedited discovery against Twitter. (Yhee Decl., Ex. B.)

**B.     Twitter's Terms of Service and Privacy Policy.**

To sign up for a Twitter account and use Twitter's services, Twitter requires users to agree to its Terms of Service and Privacy Policy. (*See id.* at ¶ 5.) During Twitter's sign-up process, Twitter notifies potential users that they must agree to Twitter's Terms of Service and Privacy Policy, and provides hyperlinks to its Terms of Service and Privacy Policy on no less than three occasions. (*See id.* at ¶¶ 6-8, Exs. C-E.) On each occasion, potential users cannot move forward in the sign-up process without pressing a button immediately below Twitter's notice and hyperlinks, confirming their agreement to abide by Twitter's Terms of Service and Privacy Policy. (*Id.*)

Twitter's Terms of Service state, in relevant part:

If you live outside of the European Union, EFTA States, or the United Kingdom, including if you live in the United States, the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated Policies.

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services . . . that link to these Terms (collectively, the "Services"), and any information text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms. . .

(*Id.* at Exs. F-G)[1] The Terms contain links to the Privacy Policy and Twitter Rules and Policies. (*Id.*)

In the Terms, Twitter expressly informs its users that any of their information may be disclosed by Twitter in various certain circumstances:

[Twitter] reserve[s] the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including any investigation of potential violations thereof, (iii) detect, prevent or, or otherwise address fraud . . . or (v) protect the rights, property, or safety of Twitter, its users and the public.

(*Id.* at Exs. F-G., Section 4.)

Twitter's Terms also incorporate by reference and provide a hyperlink to its Privacy Policy. (*Id.* at Exs. F-G, Section 4.) Twitter's Privacy Policy expressly notifies its users that when they "Tweet, post, and share" any information with the general public:

You are directing us to disclose that information as broadly as possible. Twitter content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public does not need to be signed in to view much of the content on Twitter. They may also find Twitter content off of Twitter, for example from query results on Internet search engines.

---

[1] Twitter updated its Terms of Service on May 18, 2023. The currently effective version of Twitter's Terms of Service and the version that was effective immediately prior are provided as Exhibits F and G, respectively.

(*Id.* at Exs. H-I, Section 3.1.)[2]

The Privacy Policy also puts users on notice that Twitter may disclose the users' information "when required by law, to prevent harm, or in the public interest":

We may preserve, use, share, or disclose your information if we believe it is reasonably necessary to:

- comply with a law, regulation, legal process, or governmental request …
- address fraud, security, or technical issues; or
- protect our rights or property, or the rights or property of those who use our services.

(*Id.* at Exs. H-I, Section 3.3).

Twitter's Privacy Policy also expressly warns its users that it collects a large amount of private and public information about the account user's activity (both on its own and from third parties), including:

- Tweets, lists, bookmarks, and communities the user is a part of;
- Interactions with other users' content, such as retweets, likes, shares, replies, mentions, tags, and broadcast interaction histories;
- Followed and follower accounts, and "when you use Direct Messages, including the contents of the messages, the recipients, and date and time of messages";
- "[L]inks [the user] interact[s] with across our services…"
- Device information and device settings, such as device and advertising ID;
- The user's "device address book, if [the user's] chosen to share it with [Twitter]."
- Information associating various devices and browsers with a single account and with "hashes of email addresses that share common components with the email address [the user] has provided"; and
- IP addresses, access times, "Twitter-generated identifiers," "identifiers associated with cookies," and "log information when [the user] click[s] on, view[s], or interacts with links on [Twitter's] services"; and
- "content viewed or actions taken on [third-party] website[s] or app[s]."

---

[2] Twitter updated its Privacy Policy on May 18, 2023. The currently effective version of the Privacy Policy and the version that was effective immediately prior are provided as Exhibits H-I, respectively.

(*Id.* at Exs. H-I, Section 1.2). The Privacy Policy also expressly states that Twitter "use[s] information [it] collect[s] to provide for the safety and security of [its] users… . This includes verifying [the user's] identity, authenticating [the user's] account, and defending against fraud, unauthorized use, and illegal activity" and "investigating and enforcing [Twitter's] policies and and [sic] terms, as well as applicable law." (*id.* at Exs. H-I, Section 2.2.) Twitter's Terms also reference and link to Twitter's Rules and Policies, one of which is a Misleading and Deceptive Identities Policy ("MDI Policy"). (*Id.* at Exs. F-G, Section 4; Exs. J-K.) The MDI Policy expressly prohibits the misappropriation and impersonation of identities:

**You may not misappropriate the identity of individuals, groups, or organizations or use a fake identity to deceive others.**

We want Twitter to be a place where people can find authentic voices. While you are not required to display your real name or image on your profile, your account should not use false profile information to represent itself as a person or entity that is not affiliated with the account owner, such that it may mislead others who use Twitter.

**What is in violation of this policy?**

We prohibit the following behaviors under this policy:

**Impersonation**

You may not pose as an existing person, group, or organization to mislead others about who you are or who you represent. Accounts that violate this policy will misrepresent their identity by using **at least two elements** of another identity, such as the name, image, or false claims of affiliation with another individual or organization in their profile or tweets.

(*Id*. at Ex. K.)

Twitter's Rules and Policies also include a Trademark Policy that provides, in relevant part:

**You may not violate others' intellectual property rights, including copyright and trademark.**

A trademark is a word, logo, phrase, or device that distinguishes a trademark holder's good or service in the marketplace. Trademark law may prevent others from using a trademark in an unauthorized or confusing manner.

**What is in violation of this policy?**

Using another's trademark in a way that may mislead or confuse people about your affiliation may be a violation of our trademark policy.

(*Id*. at Exs. J, L.)

### C. Roadget's Subpoena to Twitter and Twitter's Response.

On February 3, 2022, Roadget filed a motion for a preliminary injunction and limited expedited discovery, in which Roadget indicated that Temu did not oppose Roadget's request or expedited discovery against third parties (including Twitter). (Yhee Decl., Ex. B, p. 1 n.1.)  In view of Temu's non-opposition, the court in the Action almost immediately granted Roadget's request for expedited discovery against Twitter, and ordered Twitter to respond to Roadget's requests "within fourteen (14) days." (Yhee Decl., Ex. M.)   With this background, it is clear that the court in the Action deemed Roadget's requests to Twitter to be narrowly tailored to the facts of the case, and worthy of expedited responses.

On February 10, 2023, counsel for Roadget issued the Subpoena to Twitter. (*See id.* at Subpoena, Ex. N.) Twitter was served with the Subpoena a few days later, on February 15, 2023. (*See id.* at Affidavit of Service, Ex. O.) The Subpoena was comprised of four requests, all of which sought documents and information related to the Imposter Twitter Accounts. (*See id*., Ex. N at Schedule A.) Specifically, Request No. 2 of the Subpoena asked for "all posts, including deleted posts, made by the Imposter Twitter Accounts, and the data relating to such posts, including likes, retweets, and comments made on those posts." (*Id*.) Request No. 3 sought "any direct messages, including deleted messages, sent or received by the Imposter Twitter Accounts." (*Id*.)

On February 23, 2023, Twitter served its responses and objections to the Subpoena. (*See id.* at Twitter's Response, "Response," Ex. P.) Twitter asserted fifteen general objections, alleging that such objections applied to each of its responses and that they "shall be deemed as continuing as to

each Request and are not waived, or limited, by Twitter's specific objections and responses." (*Id.* At pp. 1-4.) Twitter also asserted various specific objections to each of the four requests and refused to produce documents for any of them. (*Id.* at pp. 4-9.) With respect to Request No. 2, Twitter responded and objected as follows:

> In addition to the foregoing [general] objections, Twitter objects to the terms "posts," "deleted posts," "Imposter Twitter Accounts," "data relating to such posts," and "likes, retweets and comments," on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of the materials sought in the Request is unclear.

> Twitter further objects to this Request to the extent that it seeks information that should be directed to the user or other non-provider entities. Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents. Various tools are available to help users access and download their information. Description of these tools are available in Twitter's Help Center.

> Twitter further objects to the Request to the extent that it seeks information that is more properly obtained by issuing discovery requests directly to a party in this action.

> Twitter further objects to the Request to the extent that it exceeds the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*, and to the extent that it seeks information that is prohibited form disclosure and/or is not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*
> Twitter further objects on the basis that all legal process must properly identify the Twitter account at-issue by providing the @username and/or URL of the subject Twitter account in question (e.g., @safety and https:/twitter.com/safety). Twitter has more than 300 million users, making it impossible to ensure that searches based on name, date of birth, address, or like information accurately identify the correct records. The Request purports to use such information in seeking to ask Twitter regarding any alleged "data relating to such posts" (emphasis added) and moreover, seemingly asks for information regarding such alleged "data relating to such posts" without providing a username or URL.

> Twitter further objects to this Request to the extent that it expressly seeks deleted content because, to the extent that any such data exists, it is not reasonably accessible.

> Subject to and without waiving these objections, Twitter responds as follows: Twitter will not produce documents in response to this Request.

1   (*Id*. at pp. 5-6.) With respect to Request No. 3, Twitter lodged the same objections as it did for

2   Request No. 2, except that, for the first objection, Twitter objected to the terms "direct messages,"

3   "deleted messages," "sent," "received," and "Imposter Twitter Accounts" on the grounds that "these

4   terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought

5   in the Request is unclear." (*Id.* at pp. 6-7.)[3]

6

7       Counsel for Twitter and Roadget met and conferred on numerous occasions by phone and by

8   email to come to an agreement on the Subpoena without court intervention. (*See, e.g.*, email

9   communications between Jonathan Hawk, David J. Stein, and Jiwon J. Yhee, attached as Group Ex.

10  Q.) Counsel started their discussions with Request No. 1, which was the least controversial of the

11  requests, then addressed Request No. 4 and, ultimately, Request Nos. 2-3. Based on Twitter's

12  representation that it did not maintain any deleted posts, messages, or other information, the scope of

13  the requests was limited to responsive materials that were not deleted. During the discussions, and

14  despite Roadget's provision of the exact Twitter handles associated with the Imposter Twitter

15  Accounts, Twitter insisted that it needed specific handles, i.e. @username, or URLs, but Twitter was

16  careful not to state that it was *incapable* of searching for any responsive documents without them.

17  (*See, e.g.*, *id.*  at April 20, 2023 emails between Jonathan Hawk and David J. Stein, attached as part

18  of Group Ex. Q.) In fact, in response to Request No. 4, Twitter was able to use the email addresses

19  and phone numbers related to three Imposter Twitter Accounts, @SHEIN_NYC, @SHEIN_DC, and

20  @SHEIN_USA_, to confirm that no other Twitter accounts were associated with these email

21  addresses and phone numbers. (*See id*. at May 5 and May 15, 2023 emails from Jonathan Hawk to

---

[3] Although Twitter also asserted objections on non-SCA grounds in its initial Response, the only objection that is relevant for the purposes of this Motion to Compel is Twitter's SCA objection. After counsel for Twitter and Roadget met and conferred on Request Nos. 2-3, Twitter expressly stated it was refusing to produce any Responsive Documents on the basis of its SCA objections.

Jiwon J. Yhee, attached as part of Group Ex. Q) (confirming that Twitter has "checked" and "does not see" any other accounts associated with the email addresses and phone numbers for the @SHEIN_NYC, @SHEIN_DC, and @SHEIN_USA_ accounts).

Roadget and Twitter were able to resolve their disputes on Request Nos. 1 and 4 of the Subpoena. Unfortunately, they were unable to do so for Request Nos. 2-3. Twitter's counsel refused to produce anything in response to these requests, based on its Stored Communications Act objections in its initial Response. (*See id.* at May 5, 2023 email from Jonathan Hawk to Jiwon J. Yhee, attached as part of Group Ex. Q.) ("Twitter is standing on its SCA objections as set forth in its response to the subpoena . . . ."). In an effort to avoid needless conflict, counsel for Roadget asked Twitter's counsel to simply confirm whether Twitter had any responsive data so that the parties were not arguing about the data in the abstract, especially if Twitter no longer maintained it and could not produce it. (*See id.* at May 1 and May 4, 2023 emails from Jiwon J. Yhee to Jonathan Hawk, attached as part of Group Ex. Q.) ("For Requests Nos. 2-3, could you let us know if Twitter has responsive data? There is little point in us going back and forth over these requests if Twitter does not maintain the requested data and cannot produce it as a result."). Rather than asking his client a simple question—does Twitter have any responsive documents, yes or no?—Twitter's counsel insisted on first arguing over the SCA and insisted that Roadget provide authorities showing that an exception to the SCA applied to the materials responsive to Request Nos. 2-3. (*See id.* at May 1-5, 2023 emails between Jonathan Hawk and Jiwon J. Yhee, attached as part of Group Ex. Q.) As of the date of filing of this Motion to Compel, Twitter still has refused to identify whether it has any materials responsive to Request Nos. 2-3.

As Twitter requested, Roadget provided case law and other authorities that clearly showed that several SCA exceptions applied to Request Nos. 2-3, including that Twitter had notified and received consent from its users via their agreement to Twitter's Terms of Service to disclose the

information sought by Roadget. (*See id*. at May 12, 2023 email from Jiwon J. Yhee to Jonathan Hawk, attached as part of Group Ex. Q.) In a further effort to resolve its disputes with Twitter without motion practice, Roadget was willing to narrow the scope of Request No. 3 to only the account information for the recipients of any direct messages sent by the Imposter Twitter Accounts, even though Roadget was actually entitled to the full scope of the request as written. (*Id*.) Roadget also stated that it was only looking for posts and direct messages that had not been deleted, based on Twitter's previous representation that it does not maintain deleted materials. (*Id*.) Twitter nevertheless refused to produce any Responsive Documents, opting instead to stand on its meritless SCA objections. (*See id.* at May 15, 2023 emails between Jonathan Hawk and Jiwon J. Yhee, attached as part of Group Ex. Q.) ("You are not entitled to the data you seek with regard to nos. 2 and 3, and the SCA is clear in [sic] that. Twitter stands on its objections.")

Thus, even though the court in the Action ordered Twitter to respond and produce documents before the end of February 2023, Twitter has managed to extend this dispute into a protracted one, denying Roadget the expedited discovery to which it is entitled.

### III.    ARGUMENT

#### A.    Legal Standard.

Federal Rule of Civil Procedure 45 permits a party to serve a subpoena on a non-party requiring production of documents, electronically stored information, or tangible things. Fed. R. Civ. P. 45(a)(1)(D). The scope of discovery under Rule 45 is the same as under Federal Rule of Civil Procedure 26(b). *Erickson v. Builder Advisor Grp. LLC*, No. 22-MC-80094-TSH, 2022 WL 1265823, at *2 (N.D. Cal. Apr. 18, 2022). Under Rule 26(b), a party "may obtain discovery regarding any matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). "The relevance standard is commonly recognized as one that is necessarily broad in scope in order to encompass any matter

that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Raya v. Barka*, 2022 WL 686460, at *4 (S.D. Cal. Mar. 8, 2022); *Brevoort v. G4S Secure Sols. (USA) Inc.*, 2022 WL 3012529, at *3 (C.D. Cal. June 21, 2022) ("Even after the 2015 amendments, courts continue to recognize that discovery relevance remains 'broad' in scope.") (cleaned up).   "For the purposes of discovery, relevancy is to be interpreted very broadly." *In re Seagate Tech. II Sec. Litig.*, No. C-89-2493 (A)-VRW, 1993 WL 293008, at *1 (N.D. Cal. June 10, 1993). Also, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

If a non-party fails to respond to a subpoena, a party seeking enforcement may file a motion in "the district where compliance is required for an order compelling product or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i); *Erickson*, 2022 WL 1265823, at *2. "Once the moving party establishes that the information requested is within the permissible scope of discovery, the burden shifts to the party opposing discovery." *Music Grp. Macao Com. Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 2170121, at *2 (N.D. Cal. May 6, 2015). An objection to a request for production of documents must "state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C); *Brevoort*, 2022 WL 3012529, at *6 (sanctioning responding party in part for refusing to amend responses to affirmatively state that no responsive information was being held on the basis of specific objections). "A proper written response should also provide sufficient information for the requesting party, and the court, to be satisfied that the responding party conducted an adequate investigation for responsive materials." *Id.* (internal quotation marks omitted).

To meet its burden, the opposing party may only raise objections that it served before the earlier of the time specified for compliance with the subpoena or fourteen days after the subpoena was served; all other objections are waived. *See* Fed. R. Civ. P. 45(d)(2)(B) (all objections must be

served "before the earlier of the time specified for compliance or 14 days after the subpoena is served"); *Schoonmaker v. City of Eureka*, No. 17-CV-06749-VC (RMI), 2018 WL 5829851, at *1 (N.D. Cal. Nov. 7, 2018) ("Failure to serve timely objections waives **all** grounds for objection.").

### B.     Twitter Does Not Object That The Responsive Documents Are Relevant.

Twitter never objected to the relevance of the Responsive Documents in its Response or at any other time. Twitter has therefore waived any objections on relevance grounds. *See Schoonmaker*, 018 WL 5829851 at *1 ("Failure to serve timely objections waives **all** grounds for objection.").[4]

Regardless, there is no doubt that the Responsive Documents are central to Roadget's case and highly relevant. The Responsive Documents directly relate to Roadget's allegations and claims in the FAC that Temu and/or other third parties acting at its direction or on its behalf are using the Imposter Twitter Accounts or directing those behind the Imposter Twitter Accounts to infringe on Roadget's SHEIN trademarks, impersonate the SHEIN brand, falsely suggest that Temu is associated with the SHEIN brand, divert consumers from SHEIN to Temu, and induce consumers to buy from Temu or download the Temu app. At a minimum, the Responsive Documents would allow Roadget (1) to confirm whether the Imposter Twitter Accounts, which impersonate the SHEIN brand and unlawfully use the SHEIN trademarks, are connected to Temu or any other persons acting on Temu's behalf or at its direction; (2) to obtain information about how these accounts were used for Temu's benefit and to Roadget's detriment; (3) to understand the full scope of Temu's wrongdoing and/or of the unlawful and unauthorized use of the SHEIN trademarks on Twitter; (4) to understand the negative

---

[4] Aside from its SCA objection, Twitter's other specific objections are also boilerplate and fail to clearly indicate whether Twitter has withheld documents on the basis of each of those objections. *See Brevoort*, 2022 WL 3012529, at *4-5 (stating that to the extent no further responsive information was being withheld on the basis of an objection, responding party "could have avoided the time and expense of the instant dispute by" stating so affirmatively, in compliance with Fed. R. Civ. P. 34(b)(2)(C)); *Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017).

effects of such wrongdoing and unauthorized use, including any actual confusion by consumers and damage to the SHEIN brand and Roadget's rights in the SHEIN trademarks; and (5) to mitigate any negative effects caused by same.

**C.      Twitter's SCA Objections Are Baseless.**

Contrary to Twitter's assertions, the SCA does not bar Twitter from producing documents and information that are responsive to Request Nos. 2-3 of the Subpoena. First, public content and data are not covered by the SCA, or, alternatively, are subject to disclosure under the "consent" exception, 18 U.S.C. § 2702(b)(3), and the "intended recipient" exception. 18 U.S.C. § 2702(b)(1). Second, private posts made by the Imposter Twitter Accounts, data relating to the same, and direct messages sent and received from the Imposter Twitter Accounts (collectively, "Private Responsive Documents") can be disclosed under the "consent" exception under 18 U.S.C. § 2702(b)(3). Third, the SCA contains several other well-recognized exceptions, divided into two categories, one for "record or other information" pertaining to the customer or subscriber (*see* 18 U.S.C. § 2702(c)), and the other for "contents of a communication" (*see* 18 U.S.C. § 2702(b)). Roadget is entitled to all "record or other information" comprising the Responsive Documents (*i.e.*, anything other than the actual message communicated by the Imposter Twitter Accounts) under the broad exception for "any person other than a government entity" (18 U.S.C. § 2702(c)(6)), and also because the users behind the Imposter Twitter Accounts consented to disclosure of this type of information. Roadget is also entitled to the public and private communications, whether posts or direct messages, because the users behind the Imposter Twitter Accounts also consented to the contents' disclosure.

**i.      Roadget is Entitled to the Public Responsive Documents.**

To the extent that any of the Responsive Documents were posted publicly, i.e., public Twitter posts and data relating to the same (collectively, "Public Responsive Documents"), Roadget is entitled to them for several reasons. As an initial matter, the SCA does not apply to the Public Responsive

Documents because the SCA only protects private communications, not communications that are shared with the general public. *Louis Vuitton Malletier, S,A v. Akanoc Sols., Inc.*, No. C07-03952 JW (HRL), 2008 WL 2783206, at *2 (N.D. Cal. July 15, 2008) (finding the defendants' SCA objections were baseless where the documents sought were publicly posted content; the legislative history and the statutory structure of the SCA clearly showed that Congress did not intend to create civil liability based on communications that are readily accessible to the general public); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 980-991 (C.D. Cal. 2010) (collecting cases and observing that the SCA was intended to reach private communications; a purely public communication does not merit protection under the SCA); *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 668 (D.N.J. 2013) ("The touchstone of the [SCA] is that it protects private information . . . cases interpreting the SCA confirm that information is protectable as long as the communicator actively restricts the public from accessing the information."); *see Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 (9th Cir. 2002) ("The legislative history of the [SCA] suggests that Congress wanted to protect electronic communications that are configured to be private . . . ."). Accordingly, Roadget is entitled to the Public Responsive Documents.

This result does not change even if the SCA somehow applies to the Public Responsive Documents because these documents can be disclosed under several SCA exceptions. The Public Responsive Documents, including their content, can be disclosed under 18 U.S.C. § 2702(b)(3) because, as discussed in *supra* Section III.C.ii, Twitter users gave consent to the disclosure of all of the Responsive Documents when they agreed to Twitter's Terms of Service, Privacy Policy, and Rules and Policies. Additionally, the Public Responsive Documents can be disclosed under Section 2702(b)(3) because Twitter users gave consent to their disclosure by making them available to the general public. H.R. Rep. No. 99-647, at 66 (1986) ("[I]mplied consent might be inferred from the

very nature of the electronic communication. For example, a subscriber who places a communication on a computer 'electronic communication board,' with a reasonable basis for knowing that such communications are freely made available to the public, should be considered to have given consent to the disclosure or use of the communication.").

The Public Responsive Documents can also be disclosed under another SCA exception, 18 U.S.C. § 2702(b)(1). Section 2702(b)(1) states that a provider may divulge the contents of a communication "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." *Id.* Here, the intended recipient of the Public Responsive Documents was the general public, including Roadget. According to Twitter's Privacy Policy, when a user Tweets, posts, or shares any information with the general public, "Twitter content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public *does not need to be signed in* to view much of the content on Twitter." (Yhee Decl., Ex. E, Section 3.1 (emphasis added).) Twitter even states that such content may be found "off of Twitter, for example from query results on Internet search engines." *Id.* Thus, the SCA does not bar Twitter from disclosing the Public Responsive Documents to Roadget. *See In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 714 (N.D. Cal. 2011) (holding that the plaintiff could not state an SCA claim against Facebook where the plaintiff alleged that the communication at issue was sent to Facebook and/or to certain advertisers, who were intended recipients), *aff'd*, 572 App'x 494 (9th Cir. 2014). Respectfully, the Court should compel Twitter to produce the Public Responsive Documents to Roadget.

ii.      **Roadget is Entitled to the Private Responsive Documents under 18 U.S.C. § 2702(b)(3), because Twitter Users Consented to the Disclosure by Agreeing to Twitter's Terms of Service, Privacy Policy, and Rules and Policies.**

To the extent that these requests ask for Private Responsive Documents, Twitter may produce them under a well-recognized exception to the SCA, 18 U.S.C. § 2702(b)(3). Section 2702(b)(3) states that a provider like Twitter may divulge the ***contents*** of a communication "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service." *Id*. Consent is implied by . . . a user's acceptance of a provider's terms of service. *See* H.R. Rep. No. 99-647, at 66 (1986) ("If conditions governing disclosure or use are spelled out in the rules of an electronic communication service, and those rules are available to users or in contracts for the provision of such services, it would be appropriate to imply consent on the part of a user to disclosures or uses consistent with those rules.").

Here, Twitter's users—including the users who operated the Imposter Twitter Accounts— agreed to Twitter's Terms of Service and Privacy Policy and were provided with hyperlinks to these documents on at least three occasions during the sign-up process. On each of these three occasions, those users could not move to the next step of the sign-up process without actively pressing a button located immediately under language advising them that they were agreeing to Twitter's Terms of Service and Privacy Policy by signing up and providing them with hyperlinks to the documents. Twitter's users also agreed to Twitter's Rules and Policies, which comprised part of the Twitter User Agreement and which were incorporated by reference into Twitter's Terms, which contained a hyperlink to the Rules and Policies. Twitter's Rules and Policies include the MDI and Trademark Policies, both of which were violated by the users who operated the Imposter Twitter Accounts.

By agreeing to Twitter's Terms of Service, Privacy Policy, and Rules and Policies, the users of the Imposter Twitter Accounts gave their consent to Twitter producing all of the Responsive Documents, including the Private Responsive Documents, to Roadget. Twitter's Terms and Policies expressly notify users that "*any information*" (whether public or private) may be disclosed as

reasonably necessary to (1) "comply with a law . . . [or] legal process;" (2) enforce the Terms, including any investigation of potential violations; (3) "prevent harm" and  "*address fraud*;" or (4) "protect . . . the rights or property of those who use our services" (here, the intellectual property rights of Roadget).  (Yhee Decl., Exs. F-G., Section 4.)

All of those reasons are present here. The Responsive Documents are required to comply with legal process, i.e., the Subpoena. The materials are required to enforce and to investigate the potential violation of Twitter's MDI and Trademark Policies, which prohibit users from violating third party intellectual property rights, including copyright and trademark rights, and from impersonating and misappropriating the identity of third party organizations to deceive other Twitter users.[5] The content of the posts in particular reflects Roadget's trademark rights being violated on Twitter, and Temu (or other bad actors who are directly or even loosely affiliated with Temu, through its affiliate program) are using the Imposter Twitter Accounts to impersonate and misappropriate Roadget's identity. The materials are required to detect, prevent, and address these bad actors' fraudulent activities on the Imposter Twitter Accounts and to protect the rights and intellectual property of Roadget. Roadget is therefore entitled to all of the Private Responsive Documents under 18 U.S.C. § 2702(b)(3). The SCA

---

[5] The contents of these private messages are particularly important here because these types of commercial impersonator accounts typically operate using fictitious names and email addresses. *See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 11 ("A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. . . . Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked."). Here, the Imposter Twitter Accounts drove traffic to Temu, the United States arm of Pinduoduo, which has been on the United States Trade Representative's Notorious Market's list since 2019. *See* Office of the United States Trade Representative, *2022 Review of Notorious Markets for Counterfeiting and Piracy*, https://ustr.gov/sites/default/files/2023-01/2022%20Notorious%20Markets%20List%20(final).pdf, at 31 (last accessed June 9, 2023).

does not support Twitter's baseless position, and the Court should compel Twitter to produce the Private Responsive Documents to Roadget.

          **iii.**       **Roadget is Also Entitled to User Account Information and Other Record Information Associated with the Responsive Documents because Roadget is Not a Governmental Entity and Twitter Users Consented to the Disclosure.**

Roadget is also entitled to data responsive to Requests Nos. 2 and 3 that constitute "record information" under two different SCA exceptions. The SCA allows a provider to "divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by [§2702](a)(1) or (a)(2)) . . . (2) with the lawful consent of the customer or subscriber; . . . [or] (6) to any person other than a governmental entity." 18 U.S.C. §§ 2702(c)(2), (6). Under the SCA, record information is data regarding the characteristics of a message that is generated in the course of communication, as opposed to "content," which refers to the "intended message conveyed by the communication, and does not include record information . . . ." *In re Zynga Priv. Litig.*, 750 F. 3d 1098, 1105-1107 (9th Cir. 2014). "For example, the data about a telephone call, including the number from which it was made, the time it was made, the number called, the length of the call . . . is not the content of the communication, it is data about the communication." *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1084 (N.D. Cal. 2018). A user's name, email address, account number, mailing address, phone numbers, billing information, date of account creation, geolocation, and other similar data constitute record information, not content. *Zynga*, 750 F. 3d at 1106 ("Record information includes the name, address, and subscriber number or identity of a subscriber or customer."); *Gonzales*, 305 F. Supp. 3d at 1085 (geolocation data is record information); *Obodai v. Indeed, Inc.* No. 13-80027-MISC EMC (KAW), 2013 WL 1191267, at *3 (N.D. Cal. Mar. 21, 2013) (holding that no "content" of communications was implicated by a subpoena seeking

"subscriber information" provided when a user created an account, such as phone numbers and alternative email addresses, and ordering production of all IP addresses used to access account, as well as the "dates and times of such access"); *Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2015 WL 1503429, at *7-8 (N.D. Cal. Apr. 1, 2015) (collecting similar cases and holding that "record information" is not confined to automatically generated data and includes email addresses, mailing addresses, phone numbers, billing information, date of account creation, and purchase authorization).

Here, Roadget is not a governmental entity. Additionally, as previously discussed in *supra* Section III.C.i, Twitter users, by agreeing to Twitter's Terms of Service, Privacy Policy, and Rules and Policies, consented to the disclosure of all information reasonably necessary to comply with legal process, enforce Twitter's Terms of Service, detect, prevent, or address fraud, or protect the rights or property of Twitter, its users, and the public. Here, such information includes the record information associated with the Responsive Documents. Thus, whether under Section 2702(c)(2) or Section 2702(6), Roadget is entitled to all record information associated with any of the Responsive Documents, including, but not limited to, the date(s) the Imposter Twitter Accounts made any posts, the dates any direct messages were sent to and from the Imposter Twitter Accounts, and the usernames, email addresses, mailing addresses, profile pictures, and other record information for the Imposter Twitter Accounts and any persons who sent or received direct messages from those accounts that were generated during the course of communication. *See Leonardo World Corp. v. Pegasus Sols., Inc.*, Case No. 5:15-mc-80165-PSG, 2015 WL 5610019, at *3 (N.D. Cal. Sept. 24, 2015) (ordering documents "sufficient to show the recipient(s), sender, date sent, date received, date read, and the date deleted of emails, email attachments, or Google Talk messages sent or received" to and from email addresses associated with plaintiff's customers with whom the user at issue communicated in furtherance of tortious scheme).

## IV.    CONCLUSION

**WHEREFORE**, for the reasons set forth in the Motion to Compel Twitter, Inc.'s Compliance with Subpoena and the accompanying Memorandum in Support, Roadget Business Pte. Ltd. respectfully requests that the Court enter an Order compelling Twitter to produce the Responsive Documents to Roadget within fourteen (14) days.


DATED:  June 28, 2023                    Respectfully Submitted,

                                         MASUDA, FUNAI, EIFERT,
                                         & MITCHELL, LTD.


                                         By: /s/ Asa W. Markel
                                             Asa W. Markel

                                         *Attorneys for Plaintiff Roadget Business Pte. Ltd.*