EXHIBIT "1"

MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
Asa W. Markel (Bar No. 263029)
amarkel@masudafunai.com
19191 South Vermont Avenue, Suite 420
Torrance, CA  90502
Telephone:  (310) 630-5900
Facsimile:  (310) 630-5909

Attorneys for Plaintiff Roadget Business Pte. Ltd.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Roadget Business Pte. Ltd., | Case No: 3:23-mc-80176 |
| Plaintiff, | |
| vs. | **DECLARATION OF JIWON J. YHEE IN SUPPORT OF ROADGET BUSINESS PTE. LTD.'S MOTION TO COMPEL TWITTER, INC.'S COMPLIANCE WITH SUBPOENA** |
| Twitter, Inc., | |
| Defendant. | Judge: <br> Date: <br> Time: <br> Courtroom: |

I, Jiwon J. Yhee hereby declares and states as follows:

1.      I am over the age of 18 and of sound mind and body. I am a principal at Masuda, Funai, Eifert & Mitchell, Ltd. I represent Roadget Business Pte. Ltd. ("Roadget") with respect to Roadget's Subpoena to Produce Documents, Information, or Objects that was issued to Twitter on February 10, 2023 and served on Twitter on February 15, 2023 in connection with a case pending in the U.S. District Court for the Northern District of Illinois, *Roadget Business Pte. Ltd. v. Whaleco., Inc., et al.*, Case No. 22-cv-07119 (the "Action"). If I were called to testify as a witness in the above-captioned matter, I could competently testify to the facts contained in this declaration.

2.      As of June 3, 2023, the Shein brand has over 29 million followers on Instagram, 7.1 followers on TikTok, and nearly 625,000 followers on Twitter.

3.      Exhibit A is a true and accurate copy of Roadget's First Amended Complaint filed in the Action.

4.      Exhibit B is a true and accurate of Roadget's Motion for Preliminary Injunction against Temu, seeking expedited discovery against Twitter, among other things.

5.      To sign up for a Twitter account and use Twitter's services, Twitter requires users to agree to its Terms of Service and Privacy Policy.

6.      On May 31, 2023, I accessed Twitter's webpage at twitter.com, which contained a "Create Account" button. Under the button, there was language that notified me that "by signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use." The phrases "Terms of Service," "Privacy Policy," and "Cookie Use" were in blue font and were hyperlinks to each of these respective documents. Exhibit C is a true and accurate copy of a screenshot that I took of Twitter's home page on May 31, 2023.

7.      When I clicked the "Create Account" button and proceeded to Step 2 of Twitter's sign up process, there was a window that again notified me that "[b]y signing up, you agree to our Terms, Privacy policy, and Cookie Use. Twitter may use your contact information, including your email address for purposes outlined in our Privacy Policy. Learn more[.]" I could not proceed to the next step of Twitter's sign up process unless I clicked the "Next" button located immediately below the previously-mentioned language. Again, the phrases "Terms of Service," "Privacy Policy," and "Cookie Use" were in blue font and were hyperlinks to each of these respective documents. Exhibit D is a true and accurate copy of a screenshot I took of Step 2 of Twitter's Sign Up Process on May 31, 2023.

8.      When I clicked the "Next" button and proceeded to Step 3 of Twitter's sign up process, there was a window that notified me, for the third time, that "[b]y signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use. Twitter may use your contact

DECLARATION OF JIWON J. YHEE IN SUPPORT OF ROADGET'S MOTION TO COMPEL

information, including your email address and phone number for purposes outlined in our Privacy Policy . . . ." I could not proceed to the next and final step of Twitter's sign up process unless I clicked the "Sign up" button located immediately below the previously-mentioned language. Again, Again, the phrases "Terms of Service," "Privacy Policy," and "Cookie Use" were in blue font and were hyperlinks to each of these respective documents. Exhibit E is a true and accurate copy of a screenshot I took of Step 3 of Twitter's Sign Up Process on May 31, 2023.

9.      Exhibit F is a true and accurate copy of the relevant portions of Twitter's Terms of Service that became effective on May 18, 2023 and that is available at https://twitter.com/en/tos.

10.      Exhibit G is a true and accurate copy of the relevant portions of the version of Twitter's Terms of Service that was effective immediately before the current version and that is also available at https://twitter.com/en/tos/previous/version-17.

11.      Exhibit H is a true and accurate copy of the relevant portions of Twitter's Privacy Policy that became effective on May 18, 2023 and that is available at https://twitter.com/en/privacy.

12.      Exhibit I is a true and accurate copy of the relevant portions of the version of Twitter's Privacy Policy that was effective immediately before the current version and that is available at https://twitter.com/en/privacy/previous/version-18.

13.      Exhibit J is a true and accurate copy of Twitter's Rules and Policies, which sets forth hyperlinks to all of Twitter's various rules and policies, including, but not limited to the Misleading and deceptive identities policy and the Trademark policy. Exhibit J is available at https://help.twitter.com/en/rules-and-policies#twitter-rules.

14.      Exhibit K is a true and accurate copy of Twitter's Misleading and deceptive identities policy that is available at https://help.twitter.com/en/rules-and-policies/twitter-impersonation-and-deceptive-identities-policy.

DECLARATION OF JIWON J. YHEE IN SUPPORT OF ROADGET'S MOTION TO COMPEL

15.     Exhibit L is a true and accurate copy of Twitter's Trademark policy that is available at https://help.twitter.com/en/rules-and-policies/twitter-trademark-policy.

16.     Exhibit M is a true and accurate copy of the court's order in the Action granting Roadget's request for expedited discovery.

17.     Exhibit N is a true and accurate copy of the Roadget's Subpoena to Produce Documents, Information, or Objections and other accompanying documents (collectively, Subpoena") issued to Twitter on February 10, 2023.

18.     Exhibit O is a true and accurate copy of the Affidavit of Service for the Subpoena, which shows that Twitter was served with the Subpoena on February 14, 2023.

19.     Exhibit P is a true and accurate copy of Twitter's response and objections to the Subpoena that Twitter served on Roadget on February 23, 2023.

20.     Group Exhibit Q are true and accurate copies of emails exchanged between counsel for Twitter and Roadget from February to May 2023 to meet and confer about the Subpoena.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 28, 2023

_Jiwon Juliana Yhee_
Jiwon J. Yhee

EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., a private limited company organized in the country of Singapore,<br><br>    Plaintiff,<br><br>v.<br><br>PDD HOLDINGS INC., a Cayman Islands corporation, and WHALECO, INC., a Delaware corporation,<br><br><br>    Defendants. | CASE NO. 1:22-cv-07119<br><br>Judge: Hon. Franklin U. Valderrama<br><br>Magistrate Judge: Hon. Jeffrey Cummings<br><br><br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff Roadget Business Pte. Ltd. ("Roadget" or "Plaintiff"), by and through its attorneys, brings this action to enjoin and seek other relief for the unlawful and infringing conduct of Defendants PDD Holdings Inc. and WhaleCo, Inc. (collectively "Defendants" or "Temu"). Temu has willfully and flagrantly infringed Roadget's exclusive and valuable trademark rights and copyright rights and has engaged in unfair competition and false and deceptive business practices, including by impersonating Roadget's well-known SHEIN brand on social media, trading off of the well-known SHEIN trademarks, and using copyrighted images owned by Roadget as part of Temu's product listings. Temu has used the SHEIN trademarks, and the goodwill associated with that brand, to unlawfully promote Temu's products and services, including its new online retail store, and to trick consumers into downloading Temu's mobile application. Roadget seeks injunctive relief and all other remedies available under the laws of the United States and the State of Illinois. Based on its knowledge of Temu's actions and upon information and belief as to other conduct, Roadget alleges as follows:

1

## NATURE OF ACTION

1.      This is an action for (i) trademark counterfeiting in violation of the Trademark Act of 1946, 15 U.S.C. § 1114; (ii) trademark infringement in violation of the Trademark Act of 1946, 15 U.S.C. § 1114; (iii) the use of false designations of origin and unfair competition in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(a); (iv) the use of false and misleading descriptions and representations in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(a); (v) contributory false advertising in violation of Trademark Act of 1946, 15. U.S.C. § 1125(a); (vi) copyright infringement under 17 U.S.C. § 101 *et seq*.; (vii) trademark dilution in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(c); (viii) trademark dilution under the Illinois Trademark Registration and Protection Act, formerly the Anti-Dilution Act, 765 ILCS 1036/65; (ix) deceptive trade practices in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*.; (x) deceptive trade practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.; (xi) unfair competition in violation of Illinois common law; (xii) product disparagement and trade libel under Illinois common law; and (xiii) unjust enrichment.

## THE PARTIES

2.      Plaintiff Roadget Business Pte. Ltd. is a private limited company organized under the laws of the country of Singapore. Roadget is the owner of the famous SHEIN trademarks in the United States (and worldwide) and owns the website located at https://us.shein.com and the corresponding mobile application.

3.      Defendant PDD Holdings Inc. ("PDD") is a Cayman Islands corporation, with a principal place of business at 28/F, No. 533 Loushanguan Road, Changning District, Shanghai, People's Republic of China and is a publicly traded company listed on the NASDAQ exchange as "PDD". PDD previously operated as Pinduoduo Inc. until it changed its name on or around February 8, 2023.  On information and belief, PDD directly operates an e-commerce platform in China under the "Pinduoduo" brand.

4.     Defendant WhaleCo, Inc. ("WhaleCo") is a Delaware corporation with a principal place of business at 31 St. James Avenue, Boston, Massachusetts 02116. On information and belief, WhaleCo operates an online retail store in the United States under the TEMU brand at https://www.temu.com (the "Temu Website"). On information and belief, while PDD holds out Pinduoduo and TEMU as "sister companies," PDD is in fact heavily involved with the operations of WhaleCo and the marketing for the TEMU brand, including by engaging influencers for influencer marketing.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331, 1337, and 1338(a) and (b), because the claims arise out of federal questions concerning trademark infringement of federally registered trademarks pursuant to 15 U.S.C. § 1114, federal unfair competition pursuant to 15 U.S.C. § 1125(a), copyright infringement pursuant to 17 U.S.C. § 101, and dilution pursuant to 15 U.S.C. § 1125(c).

6.     This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to § 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

7.     This Court has personal jurisdiction over WhaleCo because WhaleCo offers for sale and sells its products to consumers in Illinois, through its website at https://www.temu.com and its corresponding mobile application. Specifically, WhaleCo purposely directs its business activities toward Illinois residents, through its website and corresponding mobile application, and various unlawful social media accounts and actions, as described below, and WhaleCo derives substantial revenue from its services in Illinois. Additionally, Roadget's claims for trademark infringement, unfair competition, dilution, deceptive trade practices, copyright infringement, and product disparagement arise from acts conducted and harm sustained in the State of Illinois. WhaleCo's conduct continuous and systematic business within the State of Illinois and played an integral part in the infringement of Roadget's trademark rights using counterfeit SHEIN marks in online

advertisements and fraudulent Twitter accounts directed at residents in this judicial district. WhaleCo is committing acts that have wrongfully caused Roadget and its affiliate harm in the State of Illinois.

8.      This Court has personal jurisdiction over PDD because, on information and belief, PDD has purposely directed its business activities towards Illinois residents by, for example, sending one or more emails to influencers who are believed to be located in the State of Illinois and/or to operate businesses out of the State of Illinois, with PDD inducing those influencers to make false and deceptive statements in connection with the promotion of Temu's goods and services to customers and potential customers of Shein (defined below in Paragraph 10) nationwide, including in Illinois, in exchange for monetary payments. This court also has personal jurisdiction over PDD as WhaleCo's parent corporation, insofar as WhaleCo offers for sale and sells products to consumers in Illinois on behalf of PDD. On information and belief, PDD controls and dominates its subsidiary WhaleCo, and does business in Illinois through its subsidiary Whaleco, which merely serves as an agent for PDD in Illinois. On information and belief, Whaleco has no purpose other than to conduct business for PDD, such that WhaleCo's existence is simply a formality, and the sole purpose of WhaleCo is to serve as a U.S.-based agent that manages the operations of PDD's online retail store operating under the TEMU brand.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions which gave rise to the claims occurred in this district. Particularly, Defendants are targeting consumers, and specifically the customers of Roadget's affiliate, nationwide—including those customers located within this district.

### FACTUAL BACKGROUND

**A.      The SHEIN Brand and Roadget's Valuable Intellectual Property Rights**

10.     Roadget's SHEIN trademarks are used to sell a wide variety of products around the world, including in the United States, where the SHEIN-branded goods and services are primarily sold by Roadget's affiliate and licensee, Shein Distribution Corporation ("SDC") through the website at https://us.shein.com (the "SHEIN Website") and through the corresponding mobile

4

application (the "SHEIN Mobile App"). Roadget and SDC are collectively referred to in this Complaint as "Shein." The SHEIN trademarks are now associated with one of the most popular online fashion and lifestyle retailers in the world. In the U.S., SDC offers a wide range of products under the SHEIN trademarks and domain name, including apparel for women, men, and children, as well as everything from home goods to pet supplies. The immense and diverse products offered in connection with the SHEIN trademarks allow consumers to stay trendy without spending a fortune on apparel and essential goods.

11.     A significant contributor to the success of the SHEIN brand has been online marketing strategies on social media platforms and fashion blogs, appealing to consumers who prefer to shop online. Specifically, the SHEIN brand has partnered with thousands of influencers, celebrities, fashion bloggers and contestants on reality shows, and has started viral trends.

12.     The popularity of the SHEIN brand among consumers has skyrocketed in the last several years. In May 2021, the SHEIN Mobile App became the most downloaded shopping mobile application in the U.S. on both iOS and Android, overtaking even downloads of Amazon's mobile application. In May 2022, that same mobile application became the most downloaded mobile application in the U.S. in *any category*, outperforming both TikTok and Instagram. The SHEIN brand also has a significant presence on social media, with over 26 million followers on Instagram, 5.5 million followers on TikTok and over 500,000 followers on Twitter (collectively, the "Genuine SHEIN Social Media Accounts"). A screen capture of the official Twitter account for the SHEIN brand, @SHEIN_Official is shown below and attached as Exhibit 1 (the "Genuine SHEIN Twitter Account"):



13. SDC offers a wide variety of SHEIN-branded goods for sale in the United States through the SHEIN Website and the SHEIN Mobile App. The SHEIN brand is extraordinarily popular, particularly with young adult consumers. A screen capture of the SHEIN Website is attached as Exhibit 2.

14. Through the substantial growth of the SHEIN brand over the last several years, the brand has developed global name recognition and goodwill. A significant component of the success of the business associated with the SHEIN brand has been the investment in building brand recognition, including through the methods of reaching consumers outlined above, as well as through registration of various intellectual property rights.

15. For example, Roadget owns the following "SHEIN" trademarks registered on the U.S. Principal Register:

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 6224013<br>SN: 88776666<br><br>Registered 12/15/2020 | (Int'l Class: 14)<br>Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; jewelry brooches; watches; hat jewelry; jewelry pins for use on hats; pins being jewelry; precious metals, unwrought or semi-wrought; jewelry accessories, namely, jewelry clips for adapting pierced earrings to clip-on earrings; jewelry findings; jewelry boxes, jewelry charms, alarm clocks, split rings of precious metal for keys |

6

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 6649062<br>SN: 87857183<br><br>Registered 2/22/2022 | (Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; t-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers, shorts; shoes; shoes, namely, flats and pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats |
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 5689042<br>SN: 87857147<br><br>Registered 3/5/2019 | (Int'l Class: 09)<br>Cell phone cases; eyeglasses; digital photo frames; bathroom scales; sunglasses; downloadable computer software in the nature of applications for purchases of clothes and fashion accessories; spectacle cases; spectacle frames; remote control apparatus for the control of televisions which the remote is designed to control; counters, namely, thread counters |
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 5944948<br>SN: 87857222<br><br>Registered 12/24/2019 | (Int'l Class: 16)<br>Posters; printed matter, namely, photographs in the field of fashion; paper; steel pens; drawing materials, namely, brushes; ink, namely, ink for pens, stamping ink; stationery; gummed tape for stationery or household use; stamps in the nature of stamp pads and ink stamps; seals; coasters of paper |
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 5893349<br>SN: 87857249<br><br>Registered 10/22/2019 | (Int'l Class: 24)<br>Bed liners in the nature of mattress covers; table liners in the nature of textile tablecloths; bed sheets; towels of textile; silk fabrics for printing patterns; travelling rugs; lap robes; pillowcases; fitted furniture covers of textile; linen cloth; canvas for tapestry or embroidery |
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 5893350<br>SN: 87857258<br><br>Registered 10/22/2019 | (Int'l Class: 26)<br>Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; bobby pins; hat ornaments not of precious metal, namely, hat trimmings |
| SHEIN (Stylized)<br><br>**SHEIN**<br><br>RN: 6649063<br>SN: 87857188<br><br>Registered 2/22/2022 | (Int'l Class: 35)<br>Advertising agency services; advisory in business management; import and export agency services; providing online marketplace for buyers of products and services; organization of exhibitions for commercial or advertising purposes; employment agency services; relocation services for companies; compiling indexes of information on the internet for commercial or advertising purposes; business auditing; sponsorship services, namely, sponsorship search, financial sponsorship search |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN (Stylized) **SHEIN** RN: 5893348 SN: 87857247 Registered 10/22/2019 | (Int'l Class: 21) Battery-powered applicators for applying cosmetics to eyelashes; daily used enamel plastic wares, namely, basins in the nature of receptacles, bowls, plates, pots, cups; daily use glassware, namely, cups, plates, pots, butter crocks; daily use chinaware, namely, basins in the nature of receptacles, bowls, plates, pots, coffee services in the nature of tableware, butter crocks, candle jars, trash cans; basting brushes; beverage glassware for serving liqueur; boxes for dispensing paper towels for household use; toothbrushes; toothpicks; combs |
| SHEIN (Stylized) **SHEIN** RN: 5840545 SN: 87857225 Registered 8/20/2019 | (Int'l Class: 18) Bags, namely, suit bags; pocket wallets; rucksacks; attaché cases; handbags; travelling trunks; key cases; bags for sports; umbrellas; imitation leather; wallets; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases sold empty; string bags for shopping |
| SHEIN RN: 6861756 SN: 88107563 Registered 10/4/2022 | (Int'l Class: 25) Bandanas; Beachwear; Belts; Blazers; Blouses; Bodysuits; Camisoles; Coats; Dresses; Footwear; Gloves; Headwear; Jackets; Jeans; Jumpsuits; Kimonos; Leggings; Lingerie; Loungewear; Pants; Robes; Rompers; Scarves; Shirts; Shorts; Skirts; Sleepwear; Socks; Sweaters; Sweatshirts; Swimwear; T-shirts; Tights; Tops as clothing; Underwear; Vests |
| SHEIN RN: 6861757 SN: 88107571 Registered 10/4/2022 | (Int'l Class: 35) On-line retail store services featuring clothing, clothing accessories, hair accessories, bags, purses, footwear, headwear, jewelry, sunglasses, belts for clothing, makeup, bedding, and cell phone cases and accessories |
| SHEIN (Stylized) *SheIn* RN: 5256688 SN: 86526588 Registered 8/1/2017 | (Int'l Class: 14) Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; brooches; watches; hat ornaments of precious metal; pins being jewelry (Int'l Class: 18) Wallets; handbags; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel utensils made of leather, namely, travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases; string bags for shopping (Int'l Class: 25) Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; T-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers; shorts; shoes; flats; pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats (Int'l Class: 26) |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| | Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; Bobby pins; hat ornaments not of precious metal |
| | (Int'l Class: 35) <br> Online retail store services in the fields of clothing, accessories, footwear, and jewelry |

Copies of these trademark registrations are attached as Exhibit 3 (the "SHEIN Marks").

16.    The trademark registrations for the SHEIN Marks are valid and subsisting.

17.    The SHEIN Marks serve as unique source identifiers for the online retail store services and products offered and sold through the SHEIN Website and the SHEIN Mobile App.

18.    The SHEIN Marks have become well known by Illinois and U.S. consumers through extensive investments in advertising. As a result of the success and popularity of the SHEIN brand and through extensive promotional efforts, the SHEIN Marks are famous, distinctive, and widely recognized by the general consuming public of both the State of Illinois (or of a geographic area within this State), and the United States.

19.    To further protect the investment in the SHEIN brand, Roadget also owns a number of copyrights, including the following copyrights registered with the U.S. Copyright Office for promotional images on the SHEIN Website and/or the SHEIN Mobile App:

| Copyright Reg. Number | Deposit Copy of Work |
|---|---|
| VA0002320444 |  |

9

| Copyright Reg. Number | Deposit Copy of Work |
|---|---|
| VA0002320442 |  |
| VA0002320439 |  |
| VA0002325368 |  |

Copies of copyright registration certificates for the above registrations are attached as Exhibit 4, and are collectively referred to as the "SHEIN Registered Copyrights."

20.     In addition to the many images that have been registered with the U.S. Copyright Office, Roadget owns several copyright applications for other images that are, or have been, displayed on the SHEIN Website and/or the SHEIN Mobile App that are pending with the U.S. Copyright Office, including the following:

| Copyright Appl. Number | Deposit Copy of Work | |
|---|---|---|
| Pending case number 1-11856789081 |  | |
| Pending case number 1-11857010711 |  | |
| Pending case number 1-11857095562 |  | |

21.     The copyright applications referenced in Paragraph 18 are collectively referred to herein as the "SHEIN Copyright Applications."[1]

---

[1] Roadget is not currently asserting the SHEIN Copyright Applications in this First Amended Complaint, but intends to further amend this Complaint once these applications mature to registration.

22.     The copyright registrations for the SHEIN Registered Copyrights are valid and enforceable.

23.     The images associated with the SHEIN Registered Copyrights and the SHEIN Copyright Applications (collectively, the "SHEIN Copyrights") are included as part of product listings on the SHEIN Website and/or the SHEIN Mobile App.

### B.     Defendants and Their Wrongful Conduct

24.     Temu launched its U.S. online shopping website called TEMU on September 1, 2022, which is available at https://www.temu.com and through a mobile application. Like the SHEIN Website and the SHEIN Mobile App, the TEMU-branded website and app offer a wide variety of products for sale, including apparel and footwear, beauty and health, home and garden, electronics, office products, and pet supplies.

25.     On information and belief, Temu entered the U.S. market with the specific intent to directly compete with Shein. In fact, as soon as Temu launched in the U.S., multiple independent publications compared Temu to Shein and one even called Temu "a Shein imitator," as shown below:



(Exhibit 5 RetailWire, https://retailwire.com/discussion/will-temu-have-shein-like-success-as-it-goes-online-in-the-u-s/.)

> **PINDUODUO · SHEIN · TEMU**
>
> ## Temu, a Shein imitator, lands in the US. Will it be able to stir up the market?
>
>  Rebbeca Ren  posted on September 2, 2022 8:29 am

(Exhibit 6, PingWest, https://en.pingwest.com/a/10723.)

> **DIRECT-TO-CONSUMER**
>
> ## Shein's New Rival, Explained
>
> Pinduoduo is a giant in China but relatively unknown in America. It's looking to change that with a new app, Temu, that sells ultra-cheap clothing, with thousands of new items added daily. Sound familiar?

(Exhibit 7 Business of Fashion, https://www.businessoffashion.com/articles/direct-to-consumer/sheins-new-rival-explained/.)

26.     The characterization of Temu as "a Shein imitator" has turned out to be prescient, with Temu actively and deliberately imitating and *pretending to be* Shein using imposter social media accounts and posts to divert consumers and business away from purchasing SHEIN-branded goods in favor of purchasing goods from Temu.

27.     Before Temu launched in the U.S., Temu was aware of the well-known SHEIN brand, and the extensive investment in that rapidly growing brand. On information and belief, Temu has actual knowledge of the SHEIN Marks and the images associated with the SHEIN Copyrights, and has visited the SHEIN Website, the SHEIN Mobile App, the Genuine SHEIN Twitter Account and the Genuine SHEIN Social Media Accounts on multiple occasions, while developing, planning to launch, and since launching its online retail store in the U.S.

28.     On information and belief, Temu considers Shein to be one of the biggest competitors – if not *the* biggest competitor – for the newly-introduced TEMU brand. On information and belief, Temu's chief marketing strategies include persuading customers of SDC to purchase products from Temu instead of purchasing SHEIN-branded products, and attempting to persuade loyal customers of Shein to switch their loyalty to Temu—and Temu has decided to

carry out these marketing strategies by actively deceiving consumers and by pretending to be Shein through online platforms such as Twitter. Competing with Shein is central to Temu's marketing strategies, and its infringement of the SHEIN Marks and its use and reproduction of the images associated with the SHEIN Copyrights are willful, tactical, and strategic choices, deliberately made by Temu in an effort to divert consumers of Shein to Temu.

29. Instead of Temu fairly competing by, for example, offering comparable products at a lower price or by offering a more diverse array of products for selection and purchase by consumers, Temu has deliberately been engaging in unfair competition by exploiting the SHEIN brand and pretending to be Shein online to promote Temu's own brand, products, and services. Temu's unlawful activity includes trademark infringement, counterfeiting, copyright infringement, false advertising, and unlawful business practices, with the intent to divert customers for SHEIN-branded goods and deceive them into downloading Temu's app or buying from Temu instead.

### i. Temu's Fraudulent Twitter Accounts

30. Temu has embarked on a deliberate scheme of impersonating, or aiding and abetting the impersonation of, Shein.

31. To accomplish this goal, Temu and/or third parties acting at Temu's direction and on its behalf have created and operated or controlled, directly or indirectly, false, fake, and fraudulent Twitter accounts that incorporate the SHEIN Marks and that have pretended to be Shein in the eyes of consumers, such as @SHEIN_DC, @SHEIN_USA_, and @SHEIN_NYC (the "Imposter Twitter Accounts"), as shown below, and attached as Exhibit 8:







32.    Temu has used the Imposter Twitter Accounts to falsely suggest that it is associated with the SHEIN brand or that it *is* "SHEIN" (i.e., the official Twitter outlet/handle for Shein), by using spurious marks that are identical to or substantially indistinguishable from the SHEIN Marks (the "Counterfeit SHEIN Marks").

33.    Temu has been attempting to impersonate Shein by using the Counterfeit SHEIN Marks with the Imposter Twitter Accounts, including through the use of the Counterfeit SHEIN Marks in the handles for the Imposter Twitter Accounts and through providing links in the profile sections of the Imposter Twitter Accounts to authentic domain names owned by Roadget, such as <shein.com>, and through the use of the same profile icons and profile photos in the Imposter Twitter Accounts as the Genuine SHEIN Twitter Account.

34.    Temu has even gone so far as to intentionally and deliberately create the false impression that the Imposter Twitter Accounts have as many followers as the Genuine SHEIN Twitter Account in its efforts to impersonate Shein, by displaying in the profile section of the Imposter Twitter Accounts the number of followers of the Genuine SHEIN Twitter Account using the same formatting that Twitter uses to display the real statistic for each account – even though

the Imposter Twitter Accounts only have a few followers. An example of this is highlighted below in a side-by-side comparison chart:

| Genuine SHEIN Twitter Account (Exhibit 1) | Temu's Imposter Twitter Account (Exhibit 8) |
|---|---|
|  | |

35.     Temu has also attempted to impersonate Shein and trick consumers into believing Temu is associated with that brand by retweeting authentic posts from the Genuine SHEIN Twitter Account and using authentic hashtags associated with the SHEIN brand, such as #SHEIN, #SHEINforall, and #SHEINSS22:



17

36.     Temu created and has used the Imposter Twitter Accounts and the Counterfeit SHEIN Marks to unlawfully promote its own fledgling e-commerce website and mobile application and to trick consumers into downloading the Temu mobile application.

37.     Temu has lured consumers, including customers or potential customers of Shein, into viewing and interacting with the Imposter Twitter Accounts through the use of the Counterfeit SHEIN Marks. Temu then took advantage of this attention with posts on the Imposter Twitter Accounts that are intended to divert consumers from buying SHEIN-branded products to using Temu instead for their purchases (the "Deceptive Twitter Posts"). In some cases, the Deceptive Twitter Posts have told consumers to join Temu while prominently using and displaying the Counterfeit SHEIN Marks, and while "winking" at those consumers about its appreciation for "supporting the new twitter [account] of SHEIN":



38.     Other Deceptive Twitter Posts have deceived consumers into downloading the Temu application by embedding innocuous links in them that only display the Counterfeit SHEIN Marks. Those posts, which do not have any Temu branding, direct consumers to "Download APP from link":

18

Those links, however, did not direct consumers to download the SHEIN Mobile App, but instead directed them to *Temu's* website to download *the Temu app*, as shown in the screen capture below:



39.    The Counterfeit SHEIN Marks used by Temu on the Imposter Twitter Accounts are identical to and confusingly similar to the SHEIN Marks in appearance, sound, meaning, and commercial impression.

40.    The Counterfeit SHEIN Marks, as used by Temu on the Imposter Twitter Accounts, falsely suggest that Temu is affiliated with, or is, Shein.

41.    Temu created and has used the Imposter Twitter Accounts to trade off the recognition and goodwill of the SHEIN Marks in order to capture the attention of actual and potential customers of SHEIN-branded goods, and to divert those people into becoming customers of Temu.

42.    Consumers who encountered Temu's Imposter Twitter Accounts would be likely to falsely believe that those accounts were operated by Shein. As a result, such consumers may believe that Temu's website and mobile application, which appear to have been advertised and promoted by "SHEIN" on the Imposter Twitter Accounts, is sponsored by, or associated with, Shein.

43.     On information and belief, Temu has earned significant profits from this wrongful conduct, with ongoing ripple effects that continue to this day. Temu's U.S.-based website and mobile application did not even exist a mere six months ago – and the TEMU brand was completely unknown to U.S. consumers at that time. Temu deliberately and strategically launched its website and mobile application in the U.S. while riding off the coattails of the SHEIN brand. Temu did this, for example, by, directly or indirectly, impersonating the SHEIN brand through the Imposter Twitter Accounts, and by using those accounts to direct consumers to buy products on Temu.com and/or to download the Temu mobile application, all the while suggesting to consumers that "SHEIN" (i.e., the Imposter Twitter Accounts, whom consumers believe to be associated with the SHEIN brand) is actively promoting the newly-launched Temu website and mobile application. On information and belief, this unlawful conduct caused U.S. consumers who would otherwise never have heard of Temu to purchase goods through Temu's website or mobile application, instead of purchasing SHEIN-branded goods through the SHEIN Website or the SHEIN Mobile App. Moreover, on information and belief, at least some of those diverted consumers (who only heard of Temu by virtue of its wrongful and infringing conduct) later spread the word to other U.S. consumers about their purchases through Temu. On information and belief, Temu would not be as successful or recognized today if Temu's fraudulent misuse of the SHEIN brand was not foundational to Temu's initial launch in the U.S.

44.     Temu's infringement of the SHEIN Marks has been knowing and willful. Temu was on constructive notice of the SHEIN Marks by virtue of their federal registrations. Further, because Temu considers the SHEIN brand to be its biggest competition, Temu had actual knowledge of Roadget's trademark rights in the SHEIN Marks, regardless of their status of registration. In fact, Temu has actively tried to hire at least some employees of Roadget and/or its affiliate(s).

45.     Temu has deliberately used counterfeit imitations of the SHEIN Marks on its Imposter Twitter Accounts. Temu knows it never asked Roadget for permission to use any of the SHEIN Marks. Temu also knows that Roadget would never agree to allow a company like Temu,

which directly competes with Shein, to use Roadget's SHEIN Marks to pretend to be "SHEIN" on social media. These days, social media is where businesses and brands can most efficiently reach their consumers. Temu knows this, which is why Temu deliberately created the Imposter Twitter Accounts – to confuse and divert consumers of SHEIN-branded goods away from Shein, to instead purchase from Temu.

46. On November 1, 2022, Roadget sent Temu a letter demanding that it immediately and permanently cease and desist from any further infringement of Roadget's intellectual property rights. A copy of that letter is attached as Exhibit 9. Temu ignored that letter.

47. On November 18, 2022, Roadget resent the demand letter to Temu and began contacting Temu's trademark counsel via email and telephone. Despite repeated follow-ups with Temu's counsel, Temu and its counsel have continued to ignore Roadget.

### ii. Temu's Infringement of the SHEIN Registered Copyrights

48. Without the permission or authorization of Roadget, Temu has also used and continues to use copyrighted images owned by Roadget in connection with the sale and distribution of goods on Temu's website.

49. Specifically, without the permission or authorization of Roadget, and with access and knowledge of the material covered by U.S. Copyright No. VA0002320444, Temu has directly reproduced, distributed, and displayed the copyrighted image with the sale and distribution of a "Girls Casual Patchwork Striped Embroidered Pullover T-Shirt." A comparison of the copyrighted material and Temu's product listing is below and attached as Exhibit 10:

| Copyrighted Material | Temu's Product Listing |
|---|---|
|  | |

50.     Without the permission or authorization of Roadget, and with access and knowledge of the material covered by U.S. Copyright No. VA0002320442, Temu has directly reproduced, distributed, and displayed the copyrighted image with the sale and distribution of a "Girls Khaki Belt Tunic Trench Coat." A comparison of the copyrighted material and Temu's product listing is below and attached as Exhibit 10:

| Copyrighted Material | Temu's Product Listing |
|---|---|
|  | |

51.     Without the permission or authorization of Roadget, and with access and knowledge of the material covered by U.S. Copyright No. VA0002325368, Temu has directly reproduced, distributed, and displayed the copyrighted image with the sale and distribution of a "2pc Boys Autumn Long Sleeve Set Kids Fashion Sports Casual Set." A comparison of the copyrighted material and Temu's product listing is below and attached as Exhibit 10:

| Copyrighted Material | Temu's Product Listing |
|---|---|
|  | |

52. Without the permission or authorization of Roadget, and with access and knowledge of the material covered by U.S. Copyright No. VA0002320439, Temu has directly reproduced, distributed, and displayed the copyrighted image with the sale and distribution of "Girls' Casual Skinny Buttoned Trousers Flared." A comparison of the copyrighted material and Temu's product listing is below and attached as Exhibit 10:

| Copyrighted Material | Temu's Product Listing |
|---|---|
|  | |

53. Without the permission or authorization of Roadget, and with access and knowledge of images on the SHEIN Website and/or the SHEIN Mobile App, Temu has also reproduced, distributed, and displayed works that are subject to currently pending copyright applications at the U.S. Copyright Office, namely pending Case Nos. 1-11856789081, 1-11857010711, and 1-11857095562. Roadget intends to amend this Complaint once the Copyright

23

Office acts on these copyright applications. A comparison of that material and Temu's product listings is below and attached as Exhibit 10:



| Pending Copyright Applications | Temu's Product Listings |
| --- | --- |

| **Pending Copyright Applications** | **Temu's Product Listings** |
|---|---|
|  | |

54. Temu is using copyrighted images that are owned by Roadget, without a license from Roadget.

55. Temu's infringement has at all times been knowing and willful. As a direct competitor, Temu has knowledge of the SHEIN Website and the SHEIN Mobile App, and it actively monitors each of same to sell competing (and sometimes identical) products. Moreover, Roadget sent Temu a cease-and-desist letter addressing infringement of the SHEIN Copyrights. (*See* Exhibit 9.) Temu ignored that letter and continued to infringe the SHEIN Copyrights.

56. On or around November 8, 2022, SDC, as Roadget's affiliate and licensee, sent a Copyright Infringement Notice to the Designated Agent to receive Notifications under the DMCA for the Temu Website pursuant to the instructions on the Temu Website at https://www.temu.com/intellectual-property-policy.html. (*See* Exhibit 11.)  While the registration certificates for the SHEIN Registered Copyrights identify the owner of those copyrights as Guangzhou Shein International Import & Export Co. Ltd., those registrations were assigned to Roadget after they issued. In the DMCA takedown notice of Exhibit 11, an individual acting on behalf of Roadget's affiliate and licensee, SDC, certified that he had "the authority to act ***on behalf of the owner***" of the copyrights at issue (emphasis added) (*i.e.*, Roadget).

25

57.     As of this filing, at least one of the webpages containing infringing images listed in that Copyright Infringement Notice is still available on the Temu Website. Thus, at least in part, Temu ignored that notice, as well as the notice given by the initial Complaint in this case (Dkt. No. 1) and continued to infringe the SHEIN Copyrights.

58.     On information and belief, Temu or its agents posted the images associated with the SHEIN Registered Copyrights on the Temu Website.

59.     On information and belief, Temu intends to continue using the images associated with the SHEIN Copyrights without the authorization of Roadget.

60.     Temu is intentionally using the infringing images to profit off the original, creative works over which Roadget has exclusive rights.

### iii.     Temu's Unlawful Influencer Pitch

61.     On information and belief, Temu has also been disseminating false and deceptive statements regarding Shein products to influencers and inducing them to make such statements in connection with the promotion of Temu's goods and services to their followers in exchange for monetary payments. In particular, Temu is providing influencers with social media guidelines (the "Influencer Guidelines") that contain the following statements to use for posting (the "Influencer Statements"):

"Shein is not the only cheap option for clothing! Check Temu.com out, cheaper and way better quality"; and

"Looking for clothes better than Shein but cheaper than revolve? Check Temu.com out."

A copy of the Influencer Guidelines is attached as Exhibit 12.

62.     For example, Temu sent Influencer 1[2] an email on October 6, 2022 attaching the Influencer Guidelines, containing the Influencer Statements that were intended to be used with

---

[2] Influencer 1 has worked for both the SHEIN and TEMU brands and publicizing the identity of Influencer 1 could jeopardize Influencer 1's relationship with either brand. Plaintiff will provide the identity of Influencer 1 when so requested by the Court or as required by law, and on a confidential basis.

posts to be made on Instagram and YouTube. A copy of the email chain and its attachments are collectively attached as Exhibit 13. On information and belief, the email attached as Exhibit 13 is representative of numerous emails sent by Temu to influencers, each of which is likely to contain the same or similar content. However, the identities of the individuals to whom Temu sent those numerous emails are known only to Temu, and Plaintiff expects that discovery will identify the identities of these email recipients.

63. The Influencer Statements are false and misleading because the clothes sold on Temu.com are not less expensive and not of "way better quality" than those sold on the SHEIN Website and/or through the SHEIN Mobile App.

64. On information and belief, some influencers have posted the Influencer Statements on social media at the direction of Temu.

65. For example, on October 1, 2022, around the time Temu launched, Catherine Quirico ("Quirico"), a popular influencer, posted the Influencer Statements on Instagram, a platform where she has over 137,000 followers. The post was liked by over 4,800 people and almost 200 users commented on the post. Quirico also acknowledges in the post that she has a "Paid partnership with shoptemu".



A true and correct copy of the Quirico Instagram post is attached as Exhibit 14.

66.     As another example, on January 18, 2023, Maureen Rainha ("Rainha"), using the social media account, @couponingwithmaureen, with over 2,000 followers on Instagram, posted a similar advertisement featuring the Influencer Statements:



A true and correct copy of the Rainha Instagram post is attached as Exhibit 15.

67.     Temu had no reason to believe that the Influencer Statements were true at the time they were distributed to influencers or disseminated to the public.

68.     On information and belief, Roadget has been harmed by the Influencer Statements. By disseminating the Influencer Statements to the influencers, Temu committed false advertising by telling the influencers that Temu products are cheaper and higher quality than SHEIN-branded products. Roadget was also harmed by the Influencer Statements because Temu induced influencers to further disseminate the Influencer Statements.

### iv. Temu's Unlawful Advertising

69.     On information and belief, beyond using Twitter in relation to the Imposter Twitter Accounts, Temu used other channels to carry out its scheme of infringement and to deceive U.S. customers.

70.     Roadget discovered advertisements on Google in the U.S. (and worldwide) that use the SHEIN Marks deceptively to promote the Temu Website:

28

(*See* Exhibit 16, collectively, the "Infringing Ads").

71.     The Infringing Ads prominently display "SHEIN" in the headline of the ad in a larger, bolded, and colored font, with the mark "Temu" only being mentioned in tiny gray font within the body of the ad and within the URL for the Temu Website at the top of the ad, as shown above.

72.     Consumers who see any of these Infringing Ads that incorporate the SHEIN Marks are likely to be deceived into believing that Temu is SHEIN, is associated with the SHEIN brand, or that SHEIN-branded products are offered for sale through the Temu Website.

73.     Consumers are likely to be deceived and/or confused by Temu's Infringing Ads because of how similar they look when compared to the advertisements for the SHEIN brand disseminated by Roadget and/or its affiliates or licensees. A comparison of Temu's Infringing Ads and a Genuine Shein Advertisement is shown below (and reflected in Exhibits 16 and 17):

| Genuine Shein Advertisement: | Ad · https://us.shein.com/   ⋮ <br><br>**SHEIN Official Online Store - Free Shipping** <br><br> New Trends in Clothes. High Quality, Up to 85% Off. Free Shipping Available! Free Return. Browse a wide range of Hot Sale Clothes. Big Savings, Limited Time Only. Free Return. Size Guide. 15% Off First Order. Customer Service Focused. Quick & Secure Checkout. |
|---|---|
| Temu's Infringing Ads: | Ad · https://www.temu.com/   ⋮ <br><br>**SHEIN - Starting From $0.99** <br><br> Awesome Price With Good Quality Here On Temu. New Users Can Enjoy Free Shipping As A Plus. Unbelievably Low Price For High-Quality Storage On Temu. Free 90-Day Returns... <br> The Treat-Yourself Sale · Men's Clothing · Kids' Fashion · Women's Fashion · Baby Products <br> Deal: 30% off For Everything <br><br> 广告 · https://www.temu.com/ ▾ <br><br> **SHEIN - Don't Miss These Great Deals** <br><br> Awesome Price With Good Quality Here On Temu. New Users Can Enjoy Free Shipping As A Plus. Unbelievably Low Price For High-Quality Storage On Temu. Free 90-Day Returns... <br> The Treat-Yourself Sale · Kids' Fashion · Kids' Collection · Jewelry And Accessories <br> Deal: 30% off For Everything |

(*Compare* Exhibit 16 to Exhibit 17).

74. When consumers click on the Infringing Ads they are directed to the Temu Website, where no SHEIN-branded products are offered for sale.

75. On information and belief, customers and potential customers who wish to visit the SHEIN Website are lured into viewing and interacting with the Temu Website instead.

76. On information and belief, Temu is diverting consumers from visiting the SHEIN Website and/or from buying SHEIN-branded products and luring those consumers into buying Temu's products through the unlawful use of the SHEIN Marks.

## COUNT I
## FEDERAL TRADEMARK COUNTERFEITING
### (15 U.S.C. § 1114)

77.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

78.     Plaintiff owns the SHEIN Marks.

79.     The SHEIN Marks are fanciful and arbitrary and are associated in the minds of the public and consumers with Plaintiff.

80.     Defendants are using marks that are identical to or indistinguishable from genuine SHEIN Marks in association with the promotion of its online retail store services, without Plaintiff's approval, authorization, or consent.

81.     Defendants' use of the Counterfeit SHEIN Marks with the Imposter Twitter Accounts and Infringing Ads has been likely to cause confusion in the minds of the public, leading the public to falsely believe that Defendants' online retail store services originate from Plaintiff and/or that Plaintiff has approved, sponsored, or otherwise associated itself with the goods and services offered for sale and/or distributed by Defendants.

82.     Defendants' use of the Counterfeit SHEIN Marks without Plaintiff's authorization or consent constitutes a willful and intentional infringement of the SHEIN Marks.

83.     Defendants' conduct is intended to exploit the strong reputation and goodwill that is exclusively associated with the SHEIN Marks, to take an unfair competitive advantage of the SHEIN Marks' goodwill without any expenditure of Defendants' own resources.

84.     Plaintiff has no control over the quality of the goods or services marketed and/or sold by Defendants. Because of the likelihood of confusion as to the source of Defendants' goods and/or services, or as to whether Defendants' goods and/or services are sponsored or endorsed by, or affiliated with, Plaintiff, in view of Defendants' blatant use of the SHEIN Marks in the Imposter Twitter Accounts and Infringing Ads to lure in consumers, and hype up Defendants using the Imposter Twitter Accounts, Plaintiff's valuable goodwill in the SHEIN Marks is at the mercy of, and being irreparably harmed by, Defendants.

31

85.     Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

86.     Plaintiff has no adequate remedy at law.

87.     As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

**COUNT II**
**FEDERAL TRADEMARK INFRINGEMENT**
**(15 U.S.C. § 1114)**

88.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

89.     Defendants are using marks that are identical to or indistinguishable from genuine SHEIN Marks in association with the promotion of its online retail store services, without Plaintiff's approval, authorization, or consent.

90.     Defendants' use of the Counterfeit SHEIN Marks with the Imposter Twitter Accounts and Infringing Ads has been likely to cause confusion in the minds of the public, leading the public to falsely believe that Defendants' online retail store services originate from Plaintiff and/or that Plaintiff has approved, sponsored, or otherwise associated itself with the goods and services offered for sale and/or distributed by Defendants.

91.     Defendants' use of the Counterfeit SHEIN Marks without Plaintiff's authorization or consent constitutes a willful and intentional infringement of the SHEIN Marks in violation of 15 U.S.C. § 1114.

92.     Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

93.     Plaintiff has no adequate remedy at law.

94.     As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT III
## FEDERAL UNFAIR COMPETITION AND FALSE DESIGNATIONS OF ORIGIN
### (15 U.S.C. § 1125(a)(1)(A))

95.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

96.     Defendants' use of the Counterfeit SHEIN Marks constitutes unfair competition and a false designation of origin or false or misleading description or representation of fact, which is likely to deceive customers and prospective customers into believing that Defendants' online retail services, as well as variety of goods for sale, are associated with or sponsored by Plaintiff, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

97.     Upon information and belief, Defendants intentionally adopted and used the Counterfeit SHEIN Marks to create consumer confusion and traffic off the reputation and goodwill associated with the SHEIN Marks.

98.     Plaintiff has no control over the quality of the goods or services marketed and/or sold by Defendants. Because of the likelihood of confusion as to the source of Defendants' goods and/or services, or as to whether Defendants' goods and/or services are sponsored or endorsed by, or affiliated with, Plaintiff, in view of Defendants' blatant use of the SHEIN Marks in the Imposter Twitter Accounts and Infringing Ads to lure in consumers and hype up Defendants using the Imposter Twitter Accounts and Infringing Ads, the valuable goodwill in the SHEIN Marks is at the mercy of, and being irreparably harmed by, Defendants.

99.     Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff. Among other things, Defendants' actions have caused and are continuing to cause monetary harm (through lost sales) as well as harm to Plaintiff's brands, goodwill, and reputation.

100.     Plaintiff has no adequate remedy at law.

101.     As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT IV
## FEDERAL FALSE ADVERTISING
## (15 U.S.C. § 1125(a)(1)(B))

102.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

103.    Upon information and belief, Defendants intentionally created the Imposter Twitter Accounts and the Infringing Ads to mislead consumers. Defendants also disseminated the Influencer Statements to an audience of influencers, including Influencer 1, Quirico, Rainha, and others, thereby falsely stating to that audience that the clothes sold on Temu.com are less expensive and of "way better quality" than those sold on the SHEIN Website and/or through the SHEIN Mobile App. The Imposter Twitter Accounts, Infringing Ads and Influencer Statements were false or misleading, and had the capacity to deceive, and that deception had a material effect on the purchasing decision of the audience of influencers and others. The Imposter Twitter Accounts, Infringing Ads and Influencer Statements also have a material effect on interstate commerce by persuading consumers (including the influencers) to purchase from Defendants instead of Shein. As a result of Temu disseminating the Imposter Twitter Accounts, Infringing Ads and Influencer Statements to at least the influencers, Plaintiff has been injured, or is likely to be injured by the Influencer Statements.

104.    Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff. Among other things, Defendants' actions have caused and are continuing to cause monetary harm (through lost sales) as well as harm to Plaintiff's brands, goodwill, and reputation.

105.    Plaintiff has no adequate remedy at law.

106.    As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT V
## CONTRIBUTORY FALSE ADVERTISING
## (15 U.S.C. § 1125(a))

107.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

108.    On information and belief, Defendants disseminated the Influencer Statements to third-party influencers, including Influencer 1, Quirico, Rainha, and others, who are believed to have published the Influencer Statements. Apart from Influencer 1, Quirico, and Rainha, however, the identities of all of the other influencers to whom Defendants disseminated the Influencer Statements are known only to Defendants. Moreover, because of difficulty of searching for social media posts and the fact that many internet search engines do not regularly index social media posts, Plaintiff is currently unable to identify additional examples of social media posts reflecting the content of the Influencer Statements without conducting discovery into third parties like Instagram, YouTube, and others. The Influencer Statements were false or misleading to consumers, and had the capacity to deceive consumers, where that deception had a material effect on the consumer's purchasing decision. The Influencer Statements have a material effect on interstate commerce by persuading consumers to purchase from Defendants instead of SHEIN-branded products. As a result of the Influencer Statements, Plaintiff has been injured, or is likely to be injured by the Influencer Statements.

109.    Defendants directly engaged with the third-party influencers' false advertising by drafting the false and misleading statements and, on information and belief, contracting with third party influencers to publish and disseminate those statements to consumers.

110.    Defendants contributed to the third-party influencer's conduct by knowingly inducing the third-party influencers to publish false and misleading representations of fact, and by materially participating in that conduct by drafting the false and misleading representations of fact, and by encouraging third-party influencers to disseminate the Influencer Statements via social media posts.

111.    Through its relationship with the third-party influencers, Defendants had direct control over the false and misleading Influencer Statements posted by the influencers.

112.    Defendants' inducement of third parties to post false and misleading statements has injured Plaintiff.

113.    Defendants' aforesaid acts have caused, and unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff. Among other things, Defendants' actions have caused and are continuing to cause monetary harm (through lost sales) as well as harm to Plaintiff's brands, goodwill, and reputation.

114.    Plaintiff has no adequate remedy at law.

115.    As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT VI
## COPYRIGHT INFRINGEMENT
## (17 U.S.C. § 101 *et seq.*)

116.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

117.    Plaintiff is the exclusive owner of the SHEIN Registered Copyrights for images of Plaintiff's products. (Exhibit 4.) The copyright registrations associated with same are valid and enforceable.

118.    Defendants had access to the SHEIN Registered Copyrights by virtue of the SHEIN Website and/or SHEIN Mobile App, which are publicly available.

119.    Defendants directly copied and/or created derivative works from the SHEIN Registered Copyrights for its infringing products offered for sale by Defendants.

120.    In copying the SHEIN Registered Copyrights, Defendants have violated the copyright laws of the United States, under 17 U.S.C. § 101 et seq.

121.    While Plaintiff is not asserting the SHEIN Copyright Applications at this time, Plaintiff intends to amend this pleading once those applications mature to registration.

122.    By reason and as a direct result of these acts of copyright infringement by Defendants, Plaintiff has suffered great and irreparable damage, the full extent of which is currently unknown, while Defendants position itself for unjust enrichment at Plaintiff's substantial expense. Plaintiff is suffering, and will continue to suffer, great and irreparable damage unless and until Defendants is enjoined by this Court.

**COUNT VII**
**FEDERAL TRADEMARK DILUTION**
**(15 U.S.C. § 1125(c))**

123.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

124.    Through the longstanding and widespread use of the SHEIN Marks in the United States, the SHEIN Marks have become impressed upon the minds of the relevant trade and consuming public as identifying the SHEIN brand, owned by Roadget. As a result, the SHEIN Marks are famous, distinctive, and widely recognized by the general consuming public in the United States, and the SHEIN Marks were famous and distinctive prior to Defendants' acts set forth above. Defendants' acts have diluted the distinctive quality of the famous SHEIN Marks, in violation of 15 U.S.C. § 1125(c).

125.    Defendants engaged in the aforesaid acts with the intent to trade off Plaintiff's reputation and/or to cause dilution of the famous SHEIN Marks.

126.    Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

127.    Plaintiff has no adequate remedy at law.

128.    As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

**COUNT VIII**
**TRADEMARK DILUTION UNDER THE**
**ILLINOIS TRADEMARK REGISTRATION AND PROTECTION ACT**
**(765 ILCS 1036/65)**

129.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

130.     Through the longstanding and widespread use of the SHEIN Marks in Illinois and in the United States, the SHEIN Marks have become impressed upon the minds of the relevant trade and consuming public as identifying the SHEIN brand, owned by Roadget. As a result, the SHEIN Marks are famous, distinctive, and widely recognized by the general consuming public in the State of Illinois, and/or within a geographic area in the State of Illinois. The SHEIN Marks were famous and distinctive prior to Defendants' acts set forth above. Defendants' acts have diluted the distinctive quality of the famous SHEIN Marks, in violation of the Illinois Trademark Registration and Protection Act, formerly known colloquially as the "Anti-Dilution Act," 765 ILCS 1036/65.

131.     Defendants engaged in the aforesaid acts with the intent to trade off Plaintiff's reputation and/or to cause dilution of the famous SHEIN Marks.

132.     Defendants' aforesaid acts are greatly diminishing and blurring the source-identifying capability of the SHEIN Marks.

133.     Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

134.     Plaintiff has no adequate remedy at law.

135.     As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, money damages in an amount to be proven at trial, insofar as Defendants willfully intended to cause dilution of the SHEIN Marks, and Plaintiff is entitled to the remedies set forth in 765 ILCS 1036/65.

## COUNT IX
## ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS 510)

136.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

137.    On information and belief, Defendants' acts of creating and disseminating the Infringing Ads, and creating and operating the Imposter Twitter Accounts, as described above, and using the Counterfeit SHEIN Marks with those accounts to trick consumers into buying products from Defendants or downloading Defendants' mobile application, were made with the intent to cause a likelihood of confusion, or of a misunderstanding as to the source, ownership and/or association with SHEIN-branded goods and services.

138.    On information and belief, Defendants have willfully engaged in the deceptive trade practices complained of herein.

139.    Defendants' acts constitute unlawful and unfair competition in violation of Illinois' Uniform Deceptive Trade Practices Act, 815 ILCS 510, in that such acts were and are unlawful, unfair, deceptive, and/or fraudulent business acts.

140.    On information and belief, Defendants have willfully engaged in the deceptive trade practices complained of herein.

141.    Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause great and irreparable injury to Plaintiff.

142.    Defendants' statutory violations and other wrongful acts have injured and threaten to continue to injure Plaintiff, including loss of customers, dilution of goodwill, confusion of existing and potential customers, injury to its reputation, and diminution in the value of its intellectual property.

143.    Defendants have unjustly gained revenue and profits by virtue of its wrongful acts that it otherwise would not have obtained and to which it is not entitled.

144.    Plaintiff has also been injured and will continue to incur attorneys' fees and costs in bringing the present action.

145.    Plaintiff has no adequate remedy at law for the wrongful actions of Defendants.

## COUNT X
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505)

146.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

147.     On information and belief, Defendants' acts of creating and disseminating the Infringing Ads, and creating and operating Imposter Twitter Accounts, as described herein, and using the Counterfeit SHEIN Marks with those accounts to trick consumers into buying products from Defendants or downloading Defendants' mobile application, have been made with the intent of causing a likelihood of confusion, or of a misunderstanding as to the source, ownership and/or association with SHEIN-branded goods and services.

148.     Defendants knew, or in the exercise of reasonable care should have known, that the posts on its Imposter Twitter Accounts relating to its association with Plaintiff were false and/or misleading.

149.     Defendants' acts constitute a violation of Illinois' Uniform Deceptive Trade Practices Act, 815 ILCS 510.

150.     On information and belief, Defendants have willfully engaged in the deceptive trade practices complained of herein.

151.     Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause great and irreparable injury to Plaintiff.

152.     Defendants' aforesaid acts have also caused injury to consumers.

153.     Defendants' statutory violations and other wrongful acts have injured and threaten to continue to injure Plaintiff, including loss of customers, dilution of goodwill, confusion of existing and potential customers, injury to its reputation, and diminution in the value of its intellectual property.

154.     Defendants have unjustly gained revenue and profits by virtue of its wrongful acts that they otherwise would not have obtained and to which they are not entitled.

155.     Plaintiff has also been injured and will continue to incur attorneys' fees and costs in bringing the present action.

156.     Plaintiff has no adequate remedy at law for the wrongful actions of Defendants.

**COUNT XI**
**UNFAIR COMPETITION**
**(ILLINOIS COMMON LAW)**

157.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth herein.

158.   Defendants have unfairly and intentionally used the SHEIN Marks to misrepresent its online retail services as originating from or having the sponsorship, affiliation, or approval of Plaintiff.

159.   Defendants have engaged in such unfair and improper conduct to trade off of, and benefit from, the reputation and goodwill in the SHEIN Marks.

160.   Defendants have derived, and continues to derive, unfair and illicit profits by trading off of the respective reputation and goodwill of the SHEIN Marks.

161.   Through its use of the Counterfeit SHEIN Marks, Defendants have unfairly caused prospective and actual customers of the SHEIN Website and/or SHEIN Mobile App to be confused as to whether Defendants is associated with the SHEIN brand. As a result, Plaintiff has lost sales and profits. Defendants have also harmed the SHEIN brand, goodwill, and reputation.

162.   The acts described above constitute unfair competition under Illinois common law.

163.   Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

164.   Plaintiff has no adequate remedy at law.

165.   Defendants' conduct was oppressive, fraudulent, and malicious, entitling Plaintiff to an award of punitive damages.

**COUNT XII**
**PRODUCT DISPARAGEMENT AND TRADE LIBEL**
**(ILLINOIS COMMON LAW)**

166.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth herein.

167.     Defendants have contracted with and induced influencers to publish false and misleading representations of fact that have disparaged the goods and services offered by Plaintiff, as well as the overall reputation of Plaintiff's business.

168.     The Influencer Statements made by Defendants to influencers and made, on information and belief, by influencers to their followers, as induced by Defendants, were directed at the quality of products sold under the SHEIN brand.

169.     The acts described above, constitute product disparagement and trade libel under this State's common law.

170.     Defendants' aforesaid acts have caused actual and special damages.

## COUNT XIII
## UNJUST ENRICHMENT
## (ILLINOIS COMMON LAW)

171.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth herein.

172.     Plaintiff has invested substantial time, resources, and money developing, growing, and promoting the SHEIN Marks and the respective goodwill and reputation associated therewith.

173.     Defendants have unfairly and intentionally used the SHEIN Marks to deceive consumers into downloading its mobile application, which directly competes with the SHEIN Website and SHEIN Mobile App.

174.     Defendants have engaged in such unfair and improper conduct in order to trade off of, and benefit from, Plaintiff's reputation and goodwill in the SHEIN Marks.

175.     Defendants have derived, and continue to derive, unfair and illicit profits by trading off of the respective reputation and goodwill of the SHEIN Marks.

176.     By trading off of and using Plaintiff's SHEIN Marks and the respective goodwill and reputation associated therewith to lure customers away from Plaintiff for Defendants' benefit, Defendants have been unjustly enriched.

177.    It would be unjust for Defendants to be permitted to retain the illicit profits they earned through the sales they made from the downloads of the Temu application that originated from consumers viewing posts created by the Imposter Twitter Accounts.

178.    The acts described above constitute unjust enrichment under Illinois common law.

179.    Defendants' aforesaid acts have caused and, unless such acts are restrained by this Court, will continue to cause substantial and irreparable injury to Plaintiff.

180.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows:

1.    That Defendants and their respective agents, servants, employees, attorneys, successors, and assigns, and any and all persons acting in concert or participating with them, or any of their successors or assigns, be preliminarily and permanently enjoined and restrained from directly or indirectly:

   a.    using the SHEIN Marks, or any reproduction, counterfeit, copy, or colorable imitation of said marks, in connection with any manner likely to cause other to believes that Defendants' goods and services are connected with Plaintiff or the SHEIN brand;

   b.    making any false or misleading statements regarding Plaintiff or SHEIN-branded goods and services, or the relationship between Plaintiff or its affiliates and Defendants;

   c.    engaging in deceptive trade practices;

   d.    engaging in consumer fraud and deceptive trade practices;

   e.    infringing the SHEIN Registered Copyrights; and

   f.    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a) through (e).

2.     That this Court find that Defendants have unlawfully, and without authorization, infringed upon and counterfeited the SHEIN Marks, committed false designation of origin, engaged in unfair competition, false advertising, dilution and contributory false advertising, all in violation of the Lanham Act, 15 U.S.C. § 1125, *et seq.*

3.     That this Court find that Defendants have unlawfully, and without authorization, infringed the material in the SHEIN Registered Copyrights, i.e., U.S. Copyright Registration Nos., VA0002320444, VA0002320442, VA0002320439, and VA0002325368.

4.     That this Court find that Defendants engaged in unfair competition in violation of the common law of the State of Illinois.

5.     That this Court find that Defendants engaged in trademark dilution under the Illinois Trademark Registration and Protection Act, formerly the Anti-Dilution Act, 765 ILCS 1036/65.

6.     That this Court find that Defendants are in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*.

7.     That this Court find that Defendants are in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.

8.     That this Court find that Defendants engaged in product disparagement and trade libel in violation of the common law of the State of Illinois.

9.     That this Court find that Defendants have been unjustly enriched.

10.     That Defendants be required to account to Plaintiff for Defendants' profits from the sale of products or downloads of the Temu application and subsequent sales of products originating from the Imposter Twitter Accounts, the Influencer Statements, the Infringing Ads, or any other advertisement in which Defendants unlawfully used the SHEIN Marks or Roadget's brands.

11.     That this case be found exceptional and Plaintiff awarded its attorney's fees pursuant to 15 U.S.C. § 1117(a).

12.    That Plaintiff be awarded damages arising out of Defendants' wrongful acts in a sum equal to three times the actual damages suffered by Plaintiff, as provided in 15 U.S.C. § 1117(b).

13.    That Defendants be found to have intentionally used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services and Plaintiff be awarded its attorney's fees pursuant to 15 U.S.C. § 1117(b).

14.    That Plaintiff be awarded statutory damages in lieu of actual damages, as provided in 15 U.S.C. § 1117(c).

15.    That Defendants be required to disgorge its profits and other ill-gotten gains.

16.    That an accounting be held and judgment rendered for damages sustained by Plaintiff on account of Defendants' false designation of origin, trademark infringement, and unfair competition.

17.    That, pursuant to 17 U.S.C. §§ 504, Plaintiff be awarded its actual damages for Defendants' willful copyright infringement and any of Defendants' profits attributable to the infringement.

18.    That Plaintiff have and recover taxable costs of this action, including reasonable attorney's fees and interest.

19.    That Plaintiff be awarded punitive damages in view of Defendants' wanton and deliberate illegal acts committed with oppression, fraud, or malice.

20.    That Plaintiff be awarded such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury as to all issues triable to a jury.

ROADGET BUSINESS PTE. LTD.

Dated: March 1, 2022      By:  */s/ Barry R. Horwitz*

Barry R. Horwitz
Barry.Horwitz@gtlaw.com

Marc H. Trachtenberg
TrachtenbergM@gtlaw.com
Jacqueline Brousseau
Jacqueline.Brousseau@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435

*Counsel for Plaintiff Roadget Business Pte. Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filings to all counsel of record.

Dated: March 1, 2023                    /s/ Barry R. Horwitz

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ROADGET BUSINESS PTE. LTD., a private
limited company organized in the country of
Singapore,

       Plaintiff,

v.

WHALECO, INC., a Delaware corporation,

       Defendant.

Civil Action No. 1:22-cv-07119

Judge: Hon. Franklin U. Valderrama

Magistrate Judge: Hon. Jeffrey Cummings

JURY TRIAL DEMANDED

## PLAINTIFF'S OPPOSED[1] MOTION FOR A PRELIMINARY INJUNCTION AND LIMITED EXPEDITED DISCOVERY

This case involves the deliberate and ongoing infringement of Plaintiff Roadget Business Pte.

Ltd.'s ("Plaintiff" or "Roadget") well-known SHEIN trademarks by Defendant WhaleCo, Inc.

("Defendant" or "Temu"). Pursuant to Rules 26, 34 and 65 of the Federal Rules of Civil Procedure and

15 U.S.C. § 1116, Plaintiff respectfully requests that the Court enjoin Defendant from continuing to

infringe upon Plaintiff's marks and permit Plaintiff to proceed with limited expedited discovery. In

support of this Motion, Plaintiff states as follows:

1.     Plaintiff owns the well-known SHEIN trademarks used with a SHEIN-branded mobile

app and online retail website that offers a wide variety of affordable, trendy apparel, footwear, home

goods, and other products. The SHEIN brand has experienced exponential growth over the last five

years, becoming one of the most popular online fashion and lifestyle retailers in the world. In the last

two years, the SHEIN mobile app first became the most downloaded *shopping* mobile app in the U.S.

---

[1] Defendant has indicated that it opposes the Motion for Preliminary Injunction and the request that Defendant be ordered to respond to limited expedited discovery. Defendant has also indicated that it does not oppose Plaintiff's request for expedited discovery directed to third parties.

on both iOS and Android (overtaking even downloads of Amazon's mobile app), and then became the most downloaded mobile app in the U.S. in *any category*, outperforming even TikTok and Instagram.

2.      Hoping to copy Roadget's success, Temu launched in the U.S. this past fall, with a TEMU-branded mobile app and online retail store that *also* offers low-priced apparel, footwear, home goods, and other products. Temu's U.S. product offerings now directly compete with the same types of goods sold through the Shein website and mobile app in the U.S. Instead of competing fairly, Temu has hijacked the SHEIN brand to launch and grow its U.S. business.

3.      Roadget has so far detected two ways that Temu has used the SHEIN trademarks to deceive and confuse customers. First, shortly after Temu's U.S. launch, Roadget discovered multiple fraudulent Twitter accounts that used the SHEIN marks to impersonate the official SHEIN Twitter account. The fake Twitter accounts used the SHEIN marks in their profile icon and bio, and published posts that also used the SHEIN marks, with many of those posts deceptively promoting Temu's fledgling site and mobile app. For example, one post used a winking emoji and expressed appreciation for consumers "supporting the new twitter [account] of SHEIN," while prominently displaying the SHEIN marks, and offering to pay consumers $10 to "Join Temu." Another Twitter post used the SHEIN marks four times without ever mentioning Temu, directing consumers to "Download APP from link" to enter a purported giveaway of $20,000—with the link redirecting consumers to a subpage of www.temu.com where those consumers could download Temu's mobile app. When Roadget complained to Temu, Temu never responded. Left with no choice and confronted with daily infringements of its intellectual property rights, Roadget filed suit (Dkt. 1).

4.      Second, even after Roadget filed suit, Temu has continued to surreptitiously create and publish deceptive online advertisements in the U.S. (and worldwide) using the SHEIN marks in the largest font in the headline of the Temu ad. The ads Roadget detected were published through Google

but may also have appeared on other search engines and websites. Consumers who see these ads with the SHEIN mark and links to Temu are likely to be confused or mistakenly believe Temu to be connected to the SHEIN brand. Consumers who are tricked into clicking the ads are diverted to Temu's website or mobile app, where no SHEIN-branded products are sold. Temu has deliberately misappropriated and exploited the goodwill in the SHEIN brand to deceive customers into visiting and buying products from its new competing online store.

5.      Temu's fraudulent Twitter accounts and deceptive ads are merely examples of infringing uses of the SHEIN mark that Roadget has found to date. But there are many technical and practical limitations to what Roadget can find through its own investigations. Due to the challenges of searching the entire internet for infringing social media accounts and online advertisements, there are likely many more infringing or fraudulent social media accounts or advertisements that Roadget has not, or cannot, find. For these reasons, Roadget also seeks limited expedited discovery from Temu regarding the full extent of its unlawful conduct.  Roadget further seeks limited expedited discovery from each of Twitter and Google relative to the information in those companies' possession regarding the fraudulent Twitter accounts and deceptive ads.

6.      As set forth in Plaintiff's accompanying Memorandum of Law in support of its Motion for Preliminary Injunction ("Memorandum") and the supporting Declaration of George Chiao, Plaintiff has shown that (1) it is likely to succeed on the merits of its trademark infringement and unfair competition claims (among other claims); (2) it has no adequate remedy of law; (3) it is being irreparably harmed and will continue to be irreparably harmed in the absence of preliminary injunctive relief; and (4) the harm to Plaintiff outweighs any harm that Defendant might suffer upon entry of the requested injunction; and (5) the requested injunction is in the public interest.

7.     Plaintiff's Memorandum further establishes that Plaintiff has shown good cause for limited expedited discovery because (1) a preliminary injunction request is pending; (2) Plaintiff's proposed expedited discovery is narrowly tailored to only what is necessary at this preliminary stage in the case; (3) the expedited discovery is being sought to mitigate existing harm, and to streamline the case, by identifying the full scope of Defendant's infringing conduct to enable a single amendment of the Complaint; (4) there is minimal burden on Defendant; and (5) Defendant has already asked to delay answering the Complaint.

8.     Defendant opposes this Motion with respect to the request for preliminary injunctive relief and the request for expedited discovery directed to Defendant, but Defendant does not oppose this Motion relative to expedited discovery directed to third parties.

WHEREFORE, for the reasons above, and as set forth in more detail in Plaintiff's Memorandum, Plaintiff respectfully requests that this Court (i) enjoin Defendant, its officers, agents, affiliates, servants, employees, and attorneys, and all persons in acting in concert or participation with them anywhere in the world, from using the SHEIN Marks, or any confusingly similar marks, in connection with the advertisement, publicity, promotion, offer for sale and/or sale of products or services  other than in truthful comparative advertising, including in particular in any manner that is (a) likely to confuse or deceive consumers into mistakenly believing there is an affiliation or connection between Plaintiff and Defendant, or (b) likely to capture consumers' attention to divert those consumers to the Temu Website or the Temu Mobile App; and (ii) allow Plaintiff to engage in limited expedited discovery regarding the scope of Temu's infringing and deceptive uses of the SHEIN Marks, or confusingly similar marks.

Respectfully submitted,

ROADGET BUSINESS PTE. LTD.

Dated: February 3, 2023                    By: /s/ *Barry R. Horwitz*

Barry R. Horwitz
Barry.Horwitz@gtlaw.com
Marc H. Trachtenberg
TrachtenbergM@gtlaw.com
Jacqueline Brousseau
Jacqueline.Brousseau@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435

*Counsel for Plaintiff Roadget Business Pte. Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the date set forth below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filings to all counsel of record.


Dated: February 3, 2023                            <u>/s/ Barry R. Horwitz       </u>

EXHIBIT "C"

# Explore

## Explore ⚙

**Fabrizio Romano** ✓ @FabrizioRomano · 58m  ···
Mourinho: "I want to stay at AS Roma but my players deserve more... and I also deserve more". 🧑‍🦱🇵🇹 #UEL

"I'm really tired to be manager, head of communication, face of the club going to stay we've been robbed..".

"I want to stay but with right conditions to give my best".



💬 448      🔁 1,962      ♡ 28.1K      📊 1.4M      📤

**kira** 👾 ✓ @kirawontmiss · 3h  ···
there's 7 billion people in the world and you're telling me NOBODY has superpowers?

## New to Twitter?

Sign up now to get your own personalized timeline!

Sign in as Jiwon
jyhee87@gmail.com

🍎 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2023 X Corp.

EXHIBIT "D"



EXHIBIT "E"



EXHIBIT "F"

Effective: May 18, 2023

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the Twitter User Agreement comprises these <u>Terms of Service</u>, our <u>Privacy Policy</u>, the <u>Twitter Rules and Policies</u>, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the Twitter User Agreement comprises these <u>Terms of Service</u>, our <u>Privacy Policy</u>, the <u>Twitter Rules and Policies</u>, and all incorporated policies.

# Twitter Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our <u>other covered services</u> (<u>https://help.twitter.com/rules-and-policies/twitter-services-and-corporate-affiliates</u>) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides Twitter and the Services, 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. The words "we," "us," and "our" mean X Corp.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our <u>Privacy Policy</u> (<u>https://www.twitter.com/privacy</u>) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://www.pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without our prior consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on Twitter for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.twitter.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/en/docs/twitter-for-websites), Twitter Cards (https://developer.twitter.com/en/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/en/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through our Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

# Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220)

for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, and 6. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

EXHIBIT "G"

- Terms of Service Archive

Download PDF

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies.

# Twitter Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by Twitter and its affiliates.

# 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, Twitter's computer systems, or the technical delivery systems of Twitter's providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. Twitter does not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Twitter may offer certain services or features for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.twitter.com/en/purchaser-terms.html).

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites), Twitter Cards (https://developer.twitter.com/en/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/en/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of the Twitter Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in Twitter's Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

# Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Ending These Terms

You may end your legal agreement with Twitter at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220)

for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, and 6. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

EXHIBIT "H"

# Twitter Privacy Policy

**Effective: May 18, 2023**

# 1.2 Information we collect when you use Twitter.



When you use our services, we collect information about how you use our products and services. We use that information to provide you with products and services, to help keep Twitter more secure and respectful for everyone, and more relevant to you.

**Usage Information.** We collect information about your activity on Twitter, including:

- Tweets and other content you post (including the date, application, and version of Twitter) and information about your broadcast activity (e.g., TwitterLive or Spaces), including broadcasts you've created and when you created them, your lists, bookmarks, and communities you are a part of.
- Your interactions with other users' content, such as retweets, likes, shares, replies, if other users mention or tag you in content or if you mention or tag them, and broadcasts you've participated in (including your viewing history, listening, commenting, speaking, and reacting).
- How you interact with others on the platform, such as people you follow and people who follow you, and when you use Direct Messages, including the contents of the messages, the recipients, and date and time of messages.
- If you communicate with us, such as through email, we will collect information about the communication and its content.
- We collect information on links you interact with across our services (including in our emails sent to you).

**Purchase and payments.** To allow you to make a payment or send money using Twitter features or services, including through an intermediary, we may receive information about your transaction such as when it was made, when a subscription is set to expire or auto-renew, and amounts paid or received.

**Device Information.** We collect information from and about the devices you use to access Twitter, including:

- Information about your connection, such as your IP address and browser type.
- Information about your device and its settings, such as device and advertising ID, operating system, carrier, language, memory, apps installed, and battery level.
- Your device address book, if you've chosen to share it with us.

**Location Information.** When you use Twitter, we collect some information about your approximate location to provide the service you expect, including showing you relevant ads. You can also choose to share your current precise location or places where you've previously used Twitter by enabling these settings in your account.

**Inferred Identity.** We may collect or receive information that we use to infer your identity as detailed below:

- When you sign into Twitter on a browser or device, we will associate that browser or device with your account. Subject to your settings, we may also associate your account with browsers or devices other than those you use to sign into Twitter (or associate your signed-out device or browser with other browsers or devices or Twitter-generated identifiers).
- When you provide other information to Twitter, including an email address or phone number, we associate that information with your Twitter account. Subject to your settings, we may also use this information in order to infer other information about your identity, for example by associating your account with hashes of email addresses that share common components with the email address you have provided to Twitter.
- When you access Twitter and are not signed in, we may infer your identity based on the information we collect.

**Log Information.** We may receive information when you view content on or otherwise interact with our products and services, even if you have not created an account or are signed out, such as:

- IP address; browser type and language; operating system; the referring webpage; access times; pages visited; location; your mobile carrier; device information (including device and application IDs); search terms and IDs (including those not submitted as queries); ads shown to you on Twitter; Twitter-generated identifiers; and identifiers associated with cookies. We also receive log information when you click on, view, or interact with links on our services, including when you install another application through Twitter.

**Advertisements.** When you view or interact with ads we serve on or off Twitter, we may collect information about those views or interactions (e.g., watching a video ad or preroll, clicking on an ad, interacting with retweets of or replies to an ad).

**Cookies and similar technologies.** Like many websites, we use cookies and similar technologies to collect additional website usage data and to operate our services. Cookies are not required for many parts of our products and services such as searching and looking at public profiles. You can learn more about how we use cookies and similar technologies here.

**Interactions with our content on third-party sites.** When you view our content on third-party websites that integrate Twitter content such as embedded timelines or Tweet buttons, we may receive log information that includes the web page you visited.



## 2.2 Foster safety and security.

We use information we collect to provide for the safety and security of our users, our products, services, and your account. This includes verifying your identity, authenticating your account, and defending against fraud, unauthorized use, and illegal activity. We also use the information to evaluate and affect the safety and quality of content on Twitter - this includes investigating and enforcing our policies and and terms, as well as applicable law.



# 3.1 When you Tweet, post, and share.

**With the general public.** You are directing us to disclose that information as broadly as possible. Twitter content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public does not need to be signed in to view much of the content on Twitter. They may also find Twitter content off of Twitter, for example from search query results on Internet search engines.

**With other Twitter users.** Depending on your <u>settings</u>, and based on the Twitter products and services you use, we share:

- Your interactions with Twitter content of other users, such as likes, and people you follow.
- Content you send to a specific Twitter user, such as through <u>Direct Messages</u>. Please keep in mind that if you've shared information like Direct Messages or protected Tweets with someone else who accesses Twitter through a third-party service, the information may be shared with the third-party service.

**With partners.** Depending on your <u>settings</u>, we also provide certain third parties with information to help us offer or operate our products and services. You can learn more about these partnerships in our <u>Help Center</u>. You can control whether Twitter shares your personal information with these partners by using the "Data sharing with business partners" option in your <u>Privacy & Safety settings</u>. (This setting does not control sharing described elsewhere in this Privacy Policy, such as when we share information with our service providers, or through partnerships other than as described in this <u>Help Center</u> article.)

## 3.3 When required by law, to prevent harm, or in the public interest.



We may preserve, use, share, or disclose your information if we believe that it is reasonably necessary to:

- comply with a law, regulation, <u>legal process, or governmental request</u>;

- protect the safety of any person, protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services;

- explain why we have removed content or accounts from our services (e.g., for a violation of <u>Twitter Rules</u>);

- address fraud, security, or technical issues; or

- protect our rights or property, or the rights or property of those who use our services.

EXHIBIT "I"



# Twitter
# Privacy Policy

# 1.2 Information we collect when you use Twitter.



When you use our services, we collect information about how you use our products and services. We use that information to provide you with products and services, to help keep Twitter more secure and respectful for everyone, and more relevant to you.

**Usage Information.** We collect information about your activity on Twitter, including:

- Tweets and other content you post (including the date, application, and version of Twitter) and information about your broadcast activity (e.g., TwitterLive or Spaces), including broadcasts you've created and when you created them, your lists, bookmarks, and communities you are a part of.
- Your interactions with other users' content, such as retweets, likes, shares, replies, if other users mention or tag you in content or if you mention or tag them, and broadcasts you've participated in (including your viewing history, listening, commenting, speaking, and reacting).
- How you interact with others on the platform, such as people you follow and people who follow you, and when you use <u>Direct Messages</u>, including the contents of the messages, the recipients, and date and time of messages.
- If you communicate with us, such as through email, we will collect information about the communication and its content.
- We collect information on links you interact with across our services (including in our emails sent to you).

**Purchase and payments.** To allow you to make a payment or send money using Twitter features or services, including through an intermediary, we may receive information about your transaction such as when it was made, when a subscription is set to expire or auto-renew, and amounts paid or received.

**Device Information.** We collect information from and about the devices you use to access Twitter, including:

- Information about your connection, such as your IP address and browser type.
- Information about your device and its settings, such as device and advertising ID, operating system, carrier, language, memory, apps installed, and battery level.
- Your device address book, if you've chosen to share it with us.

**Location Information.** When you use Twitter, we collect some information about your approximate location to provide the service you expect, including showing you relevant ads. You can also choose to share your current precise location or places where you've previously used Twitter by enabling these settings in your account.

**Inferred Identity.** We may collect or receive information that we use to infer your identity as detailed below:

- When you sign into Twitter on a browser or device, we will associate that browser or device with your account. Subject to your settings, we may also associate your account with browsers or devices other than those you use to sign into Twitter (or associate your signed-out device or browser with other browsers or devices or Twitter-generated identifiers).
- When you provide other information to Twitter, including an email address or phone number, we associate that information with your Twitter account. Subject to your settings, we may also use this information in order to infer other information about your identity, for example by associating your account with hashes of email addresses that share common components with the email address you have provided to Twitter.
- When you access Twitter and are not signed in, we may infer your identity based on the information we collect.

**Log Information.** We may receive information when you view content on or otherwise interact with our products and services, even if you have not created an account or are signed out, such as:

- IP address; browser type and language; operating system; the referring webpage; access times; pages visited; location; your mobile carrier; device information (including device and application IDs); search terms and IDs (including those not submitted as queries); ads shown to you on Twitter; Twitter-generated identifiers; and identifiers associated with cookies. We also receive log information when you click on, view, or interact with links on our services, including when you install another application through Twitter.

**Advertisements.** When you view or interact with ads we serve on or off Twitter, we may collect information about those views or interactions (e.g., watching a video ad or preroll, clicking on an ad, interacting with retweets of or replies to an ad).

**Cookies and similar technologies.** Like many websites, we use cookies and similar technologies to collect additional website usage data and to operate our services. Cookies are not required for many parts of our products and services such as searching and looking at public profiles. You can learn more about how we use cookies and similar technologies here.

**Interactions with our content on third-party sites.** When you view our content on third-party websites that integrate Twitter content such as embedded timelines or Tweet buttons, we may receive log information that includes the web page you visited.

## 2.2 Foster safety and security.



We use information we collect to provide for the safety and security of our users, our products, services, and your account. This includes verifying your identity, authenticating your account, and defending against fraud, unauthorized use, and illegal activity. We also use the information to evaluate and affect the safety and quality of content on Twitter - this includes investigating and enforcing our policies and and terms, as well as applicable law.

## 3.1 When you Tweet, post, and share.

⌃
⌄

**With the general public.** You are directing us to disclose that information as broadly as possible. Twitter content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public does not need to be signed in to view much of the content on Twitter. They may also find Twitter content off of Twitter, for example from search query results on Internet search engines.

**With other Twitter users.** Depending on your <u>settings</u>, and based on the Twitter products and services you use, we share:

- Your interactions with Twitter content of other users, such as likes, and people you follow.
- Content you send to a specific Twitter user, such as through <u>Direct Messages</u>. Please keep in mind that if you've shared information like Direct Messages or protected Tweets with someone else who accesses Twitter through a third-party service, the information may be shared with the third-party service.

**With partners.** Depending on your <u>settings</u>, we also provide certain third parties with information to help us offer or operate our products and services. You can learn more about these partnerships in our <u>Help Center</u>. You can control whether Twitter shares your personal information with these partners by using the "Data sharing with business partners" option in your <u>Privacy & Safety settings</u>. (This setting does not control sharing described elsewhere in this Privacy Policy, such as when we share information with our service providers, or through partnerships other than as described in this <u>Help Center</u> article.)

## 3.3 When required by law, to prevent harm, or in the public interest.



We may preserve, use, share, or disclose your information if we believe that it is reasonably necessary to:

- comply with a law, regulation, legal process, or governmental request;

- protect the safety of any person, protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services;

- explain why we have removed content or accounts from our services (e.g., for a violation of Twitter Rules);

- address fraud, security, or technical issues; or

- protect our rights or property, or the rights or property of those who use our services.

EXHIBIT "J"

📝 Rules and policies

- <u>General</u> Understand the Twitter Rules and policies

- **<u>Platform integrity and authenticity</u>** Policies that promote the health of the public conversation by investigating and mitigating material related to spam, platform manipulation, API abuse, and information operations

- **<u>Safety and cybercrime</u>** Policies that enforce our principles against abuse, harassment, violence and criminal actions on the Twitter platform

- **<u>Intellectual-property</u>** Policies that protect Intellectual Property rights of individual and organizations on the Twitter Platform

- **<u>Platform Use Guidelines</u>** Policies and information relating to using the Twitter platform

- **<u>Account Settings</u>** Articles and policies that assist users in setting up their account and settings

- **<u>Law enforcement guidelines</u>** Information for law enforcement

- **<u>Research and experiments</u>** How Twitter conducts research and experiments on the platform

- **<u>Country-specific resources</u>** Articles that describe how Twitter supports applicable local laws

General

Last viewed
<u>The Twitter Rules</u>
Last viewed
<u>Deceased individuals</u>
Last viewed
<u>Username squatting policy</u>
Platform integrity and authenticity

Last viewed
<u>Crisis misinformation policy</u>
Last viewed
<u>Civic integrity policy</u>
Last viewed
<u>Platform manipulation and spam policy</u>
Last viewed
<u>Ban evasion policy</u>
Last viewed
<u>Misleading and deceptive identities policy</u>
Last viewed
<u>Synthetic and manipulated media policy</u>
Last viewed
<u>Copypasta and duplicate content policy</u>
Last viewed
<u>Financial scam policy</u>
Last viewed
<u>Distribution of hacked materials policy</u>
Safety and cybercrime

Last viewed

Illegal or certain regulated goods or services

Last viewed

Hateful Conduct

Last viewed

Abuse and harassment

Last viewed

Violent and hateful entities policy

Last viewed

Sensitive media policy

Last viewed

Glorification of violence policy

Last viewed

Perpetrators of violent attacks policy

Last viewed

Violent Speech Policy

Last viewed

Private information policy

Last viewed

Non-consensual nudity policy

Last viewed

Suicide and Self-harm Policy

Last viewed

Abusive profile information

Last viewed

Child sexual exploitation policy

Intellectual property


Last viewed

Copyright policy

Last viewed

Trademark policy

Last viewed

Counterfeit policy

Last viewed

Automated copyright claims for live video

Platform Use Guidelines


Last viewed

How cookies are used on Twitter

Last viewed

Our range of enforcement options

Last viewed

About country withheld content

Last viewed

Defending and respecting the rights of people using our service

Last viewed

About government and media account labels on Twitter

Last viewed

Inactive account policy

Last viewed

Professional account policy

Last viewed

Automation rules
Last viewed
About specific instances when a Tweet's reach may be limited
Last viewed
About government and media account labels on Twitter
Last viewed
Twitter shopping policies
Last viewed
Twitter's Creator Monetization Standards📈
Last viewed
Report violations
Last viewed
Misuse of Reporting Features Policy
Last viewed
Paid Partnerships policy
Last viewed
Twitter, our services, and corporate affiliates
Last viewed
About rules and best practices with account behaviors
Last viewed
Twitter Moments guidelines and principles
Last viewed
About Twitter limits
Last viewed
Super Follows policy
Last viewed
Guidelines for Promotions on Twitter
Last viewed
About public-interest exceptions on Twitter
Last viewed
Notices on Twitter and what they mean
Last viewed
Fair use policy
Last viewed
About search rules and restrictions
Last viewed
How to report security vulnerabilities
Last viewed
About Twitter's APIs
Last viewed
Vine Camera Terms of Service and privacy policy
Last viewed
Curation style guide
Last viewed
Reporting false information in France
Last viewed
Updates to our Terms of Service and Privacy Policy
Last viewed
Additional information about data processing
Last viewed
Our approach to policy development and enforcement philosophy
Account Settings

Last viewed

Using Twitter📈

Last viewed

Your media settings

Last viewed

Safety and security📈

Last viewed

How to contact Twitter about a deceased family member's account

Law Enforcement Guidelines

Last viewed

Legal request FAQs

Last viewed

Guidelines for law enforcement

Research and Experiments

Last viewed

Twitter Voices, Twitter Insiders, and Creator Insiders Terms of Use

Last viewed

About user research at Twitter

Last viewed

What is the Twitter iOS Beta program?

Last viewed

About the Twitter Experiments Program

EXHIBIT "K"

# Misleading and deceptive identities policy

## Overview

## April 2023

# You may not misappropriate the identity of individuals, groups, or organizations or use a fake identity to deceive others.

We want Twitter to be a place where people can find authentic voices. While you are not required to display your real name or image on your profile, your account should not use false profile information to represent itself as a person or entity that is not affiliated with the account owner, such that it may mislead others who use Twitter.

## What is in violation of this policy?

We prohibit the following behaviors under this policy:

### Impersonation

You may not pose as an existing person, group, or organization to mislead others about who you are or who you represent. Accounts that violate this policy will misrepresent their identity by using **at least two elements** of another identity, such as the name, image, or false claims of affiliation with another individual or organization in their profile or tweets.

### Deceptive Identities

You may not pose as someone who doesn't exist to mislead others about who you are or who you represent. This includes using at least one element of someone else's identity on your profile or tweets in a misleading way, such as using another individual's image or making a false statement of affiliation with an existing individual or entity. We also consider accounts to be deceptive if they use a computer generated image of a person to pose as someone who doesn't exist.

# What is not a violation of this policy?

We believe giving people choice in terms of how they represent themselves online enables them to express themselves and control their privacy. Twitter allows the use of pseudonymous accounts, meaning an account's profile is not required to use the name or image of the account owner. Accounts that appear similar to others on Twitter are not in violation of this policy, so long as their purpose is not to deceive or manipulate others. Accounts that share your name but have no other commonalities are not in violation of this policy.

**Parody, Commentary, or Fan Accounts**

Accounts that depict another person, group, or organization in their profile to discuss, satirize, or share information about that entity are not in violation of this policy. While these accounts may use elements of another's identity, they also include profile language or other indicators that inform people on Twitter that the account is not affiliated with the subject of the profile.

To avoid confusing others about an account's affiliation, Parody, Commentary, and Fan accounts must distinguish themselves in their account name and in their bio. Accounts that fail to sufficiently distinguish themselves are considered non-compliant and in violation of this policy.

- **Account name:** The account name should clearly indicate that the account is not affiliated with the subject portrayed in the profile. Accounts can indicate this by incorporating words such as, but not limited to, "parody," "fake," "fan," or "commentary." This language should be stated in a way that can be understood by any audience and should not be contradicted by other affiliation terminology such as "official." Please note, an account name is separate from the username (i.e. @handle).
- **Bio:** The bio should clearly state that the account is not affiliated with the subject portrayed in the profile. Non-affiliation can be indicated by incorporating words such as, but not limited to, "not affiliated with," "parody," "fake," "fan," or "commentary." This language should be stated in a way that can be understood by any audience.

# How can I report violations of this policy?

If you believe an account is posing as you or your brand, you can file a report here. If you believe an account is using a deceptive fake identity or misusing the identity of somebody else, you can flag it as a bystander by reporting directly from the account's profile.

In cases where an account is suspected of misusing a specific individual or entity's identity, we may need more information to determine whether the account is run or authorized by the entity portrayed in the profile. To ensure we have enough context, we may need a report from the portrayed party in order to take action.

# What happens if you violate this policy?

The consequences for violating the policy depend on the severity and type of violation, as well as an account's history of previous violations. The actions we take may include the following:

**Profile modifications**

If your account is potentially confusing in terms of its affiliation, including as a non-compliant parody, commentary or fan account, we may require you to edit the content on your profile. If you violate this policy again after your first warning, your account may be suspended.

**Suspension**

If you are engaged in impersonation or are using a deceptive identity, we may suspend your account. If we believe you may be in violation of this policy, we may require you to provide government issued identification (such as a driver's license or passport) in order to reinstate your account.

If you believe that your account was locked or suspended in error, you can <u>submit an appeal</u>.

# Additional resources

To report an account that may be misusing your trademark, please see our <u>trademark policy.</u> For information about our spam rules, you can read more on our <u>platform manipulation and spam</u> policy. You may submit feedback using this <u>form</u>.

EXHIBIT "L"

# Trademark policy

## Overview

**April 2023**

**You may not violate others' intellectual property rights, including copyright and trademark.**

A trademark is a word, logo, phrase, or device that distinguishes a trademark holder's good or service in the marketplace. Trademark law may prevent others from using a trademark in an unauthorized or confusing manner.

# What is in violation of this policy?

Using another's trademark in a way that may mislead or confuse people about your affiliation may be a violation of our trademark policy.

# What is not a violation of this policy?

Referencing another's trademark is not automatically a violation of Twitter's trademark policy. Examples of non-violations include:

- using a trademark in a way that is outside the scope of the trademark registration e.g., in a different territory, or a different class of goods or services than that identified in the registration; and
- using a trademark in a nominative or other fair use manner. For more information, see our Misleading and deceptive identities policy.

# Who can report violations of this policy?

Twitter only investigates requests that are submitted by the trademark holder or their authorized representative e.g., a legal representative or other representative for a brand.

# How can I report violations of this policy?

You can submit a trademark report through our trademark report form. Please provide all the information requested in the form. If you submit an incomplete report, we'll need to follow up about the missing information. Please note that this will result in a delay in processing your report.

**Note:** We may provide the account holder with your name and other information included in the copy of the report.

# What happens if you violate this policy?

If we determine that you violated our trademark policy, we may suspend your account. Depending on the type of violation, we may give you an opportunity to comply with our policies. In other instances, an account may be permanently suspended upon first review. If you believe that your account was suspended in error, you can submit an appeal.

# Additional resources

Learn more about our range of enforcement options and our approach to policy development and enforcement.

EXHIBIT "M"

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

ROADGET BUSINESS PTE. LTD.,

    *Plaintiff*,

v.

WHALECO, INC.,

    *Defendant*.

Civil Action No. 1:22-cv-07119

Judge: Hon. Franklin U. Valderrama

Magistrate Judge: Hon. Jeffrey Cummings

JURY TRIAL DEMANDED

## ORDER GRANTING THIRD PARTY EXPEDITED DISCOVERY

**THIS MATTER** is before the Court on a Motion for Expedited Discovery (the "Motion") filed by Plaintiff Roadget Business Pte. Ltd. ("Plaintiff" or "Roadget") against Defendant WhaleCo, Inc. ("Defendant" or "Temu"). Plaintiff alleges that Defendant created Imposter Twitter Accounts and Infringing Ads (as defined in Plaintiff's Motion and accompanying declaration) that improperly use Plaintiff's SHEIN Marks (as also defined in the Motion and accompanying declaration). Plaintiff has requested that it be granted leave to conduct expedited discovery against third parties Google and Twitter, towards obtaining and preserving relevant evidence. Defendant does not oppose the request for expedited discovery against these third parties.

Accordingly, the Court finds that expedited discovery is warranted, and it is hereby ORDERED that Plaintiff may immediately issue the subpoenas to Google and Twitter attached as Exhibits C-D to the Motion, and that Google and Twitter are to respond within fourteen (14) days.

SO ORDERED:

DATE: 2/3/2023

The Hon. Franklin U. Valderrama
United States District Judge

EXHIBIT "N"

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ROADGET BUSINESS PTE. LTD.,     )
                                           )
          Plaintiff,       )
                                           )     Case No.  22-cv-07119
     v.                          )
                                           )     Honorable Franklin U. Valderrama
WHALECO, INC.,               )
                                           )
          Defendant.     )

## <u>NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS</u>

TO:    See attached Service List

      PLEASE TAKE NOTICE that pursuant to the attached Subpoena, the undersigned will command TWITTER, INC. to produce documents to the undersigned as described in the attached Subpoena.

                                **ROADGET BUSINESS PTE. LTD.**

                                By: /s/ David J. Stein

                                David J. Stein
                                Masuda, Funai, Eifert & Mitchell, Ltd.
                                203 North LaSalle Street, Suite 2500
                                Chicago, Illinois 60601
                                Tel: (312) 245-7500
                                Fax: (312) 245-7467
                                dstein@masudafunai.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 10, 2023, the foregoing **NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS** was served upon all counsel of record listed below via email transmission.

Kelly Hope Yin
Russell Luke Kostelak
Victor Jih
Wilson Sonsini Goodrich & Rosati, P.C.
1900 Avenue of the Stars, 28th Floor
Century City, California 90067
kyin@wsgr.com
rkostelak@wsgr.com
vjih@wsgr.com

Quifan Huang
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, California 94304
qhuang@wsgr.com

Ryan S. Benyamin
Wilson Sonsini Goodrich & Rosati, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
rbenyamin@wsgr.com

Steven P. Mandell
Mandell Menkes, LLC
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
smandell@mandellmenkes.com

Barry Ryan Horwitz
Jacqueline Victoria Brousseau
Marc H. Trachtenberg
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
horwitzb@gtlaw.com
brousseauj@gtlaw.com
trachtenbergm@gtlaw.com

/s/ David J. Stein

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.    1:22-cv-07119 |
| WHALECO, INC., | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Twitter, Inc. c/o CT Corporation California, Registered Agent
330 North Brand Boulevard, Glendale, CA 91203

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See Schedule A

| Place: Jan Brown & Associates<br>701 Battery Street, 3rd Floor<br>San Francisco, CA 94111 | Date and Time:<br><br>02/24/2023 9:00 am |
|---|---|

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    02/10/2023

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | /s/ David J. Stein |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Roadget Business Pte. Ltd.  , who issues or requests this subpoena, are:

David Stein of Masuda, Funai, Eifert & Mitchell, Ltd., 203 N. LaSalle St., Ste. 2500, Chicago, IL 60601, dstein@masudafunai.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:22-cv-07119

# PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____        _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### Instructions

1.     For purposes of interpreting or construing the following requests, the terms used are to be given their most expansive and inclusive interpretation unless otherwise specifically limited in the request itself.  This includes, without limitation, the following:

    a.    Construing the words "and" and "or" used in any request in the disjunctive or conjunctive as necessary, to make the request more inclusive;

    b.    Construing the words "any" and "all" used in any request to mean "any and all" as necessary to make the request more inclusive;

    c.    Construing the singular form of any word to include the plural and the plural form to include the singular; and

    d.    Construing the masculine form to include the feminine and/or the gender neutral form.

2.     These requests shall be deemed to seek answers as of the date hereof and to the full extent of the Federal Rules of Civil Procedure.  Furthermore, these requests are of a continuing nature.

3.     If any information called for is withheld on the basis of a claim or privilege or attorney work-product, the claimed basis for withholding the information and the nature of the information withheld shall be set forth in a privilege log satisfying the requirements of Federal Rule of Civil Procedure 26(c) that includes a statement of all the circumstances which will be relied upon to support such a claim.

4.     If you object to any part of a request and refuse to answer that part, state your objection and answer the remaining portion of that request.

5.      If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have concerning the unanswered portions.  If your answer is qualified in any manner, set forth the details of such qualification.

6.      If, in responding to the requests, you claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable thereto, such claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

7.      In responding to the requests in this subpoena, please furnish all documents available to you, not merely such documents as the persons preparing the responses know of their own personal knowledge.  For purposes of these requests, documents belonging to persons other than you but to which you have routine access in the ordinary course of business are considered available to you.  In responding to the requests in this subpoena, Plaintiffs request that you  conduct a diligent search of your records or other papers and materials in its possession or the possession of its employees, attorneys, consultants, or other representatives, alive or deceased, to the extent necessary to provide responsive documents.

8.      Unless otherwise indicated, these requests seek documents from the past six months through the present.

9.      You are to produce all documents that are responsive in whole or in part to any of the requests herein in full, without abridgement, abbreviation, or expurgation of any sort, and regardless of whether you deem such documents to be irrelevant to the issues for which such

documents are being sought.  If any document cannot be produced in its entirety, produce as much of the document as possible and indicate in your written response what portion of the document is not produced and why it could not be produced.

## DEFINITIONS

1.      The term "Plaintiff" refers to Plaintiff Roadget Business Pte. Ltd. and its affiliates.

2.      The term "Defendant" or "Temu" refers WhaleCo., Inc., any of its affiliates, or any person acting on behalf of WhaleCo, or at WhaleCo's direction.

3.      The terms "You," "Your," or any form of those terms refers to Twitter Inc.

4.      The "SHEIN Marks" refer collectively to any and all forms of the trademark "SHEIN," including at least one of the following marks:

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 6224013<br>SN: 88776666<br><br>Registered 12/15/2020<br>First Used 4/30/2017 | (Int'l Class: 14)<br>Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; jewelry brooches; watches; hat jewelry; jewelry pins for use on hats; pins being jewelry; precious metals, unwrought or semi-wrought; jewelry accessories, namely, jewelry clips for adapting pierced earrings to clip-on earrings; jewelry findings; jewelry boxes, jewelry charms, alarm clocks, split rings of precious metal for keys |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 6649062<br>SN: 87857183<br><br>Registered 2/22/2022<br>First Used 4/30/2017 | (Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; t-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers, shorts; shoes; shoes, namely, flats and pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 5689042<br>SN: 87857147 | (Int'l Class: 09)<br>Cell phone cases; eyeglasses; digital photo frames; bathroom scales; sunglasses; downloadable computer software in the nature of applications for purchases of clothes and fashion accessories; spectacle cases; spectacle frames; remote control apparatus for the |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| Registered 3/5/2019<br>First Used 11/14/2015 | control of televisions which the remote is designed to control; counters, namely, thread counters |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 5944948<br>SN: 87857222<br><br>Registered 12/24/2019<br>First Used 8/25/2019 | (Int'l Class: 16)<br>Posters; printed matter, namely, photographs in the field of fashion; paper; steel pens; drawing materials, namely, brushes; ink, namely, ink for pens, stamping ink; stationery; gummed tape for stationery or household use; stamps in the nature of stamp pads and ink stamps; seals; coasters of paper |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 6649063<br>SN: 87857188<br><br>Registered 2/22/2022<br>First Used 6/29/2016 | (Int'l Class: 35)<br>Advertising agency services; advisory in business management; import and export agency services; providing online marketplace for buyers of products and services; organization of exhibitions for commercial or advertising purposes; employment agency services; relocation services for companies; compiling indexes of information on the internet for commercial or advertising purposes; business auditing; sponsorship services, namely, sponsorship search, financial sponsorship search |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 5893348<br>SN: 87857247<br><br>Registered 10/22/2019<br>First Used 1/16/2018 | (Int'l Class: 21)<br>Battery-powered applicators for applying cosmetics to eyelashes; daily used enamel plastic wares, namely, basins in the nature of receptacles, bowls, plates, pots, cups; daily use glassware, namely, cups, plates, pots, butter crocks; daily use chinaware, namely, basins in the nature of receptacles, bowls, plates, pots, coffee services in the nature of tableware, butter crocks, candle jars, trash cans; basting brushes; beverage glassware for serving liqueur; boxes for dispensing paper towels for household use; toothbrushes; toothpicks; combs |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 5893349<br>SN: 87857249<br><br>Registered 10/22/2019<br>First Used 1/16/2018 | (Int'l Class: 24)<br>Bed liners in the nature of mattress covers; table liners in the nature of textile tablecloths; bed sheets; towels of textile; silk fabrics for printing patterns; travelling rugs; lap robes; pillowcases; fitted furniture covers of textile; linen cloth; canvas for tapestry or embroidery |
| SHEIN (Stylized) | (Int'l Class: 26)<br>Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; bobby pins; hat ornaments not of precious metal, namely, hat trimmings |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| **SHEIN**<br>RN: 5893350<br>SN: 87857258<br><br>Registered 10/22/2019<br>First Used 1/16/2018 | |
| SHEIN (Stylized)<br>**SHEIN**<br>RN: 5840545<br>SN: 87857225<br><br>Registered 8/20/2019<br>First Used 1/16/2018 | (Int'l Class: 18)<br>Bags, namely, suit bags; pocket wallets; rucksacks; attaché cases; handbags; travelling trunks; key cases; bags for sports; umbrellas; imitation leather; wallets; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases sold empty; string bags for shopping |
| SHEIN<br>RN: 6861756<br>SN: 88107563<br><br>Registered 10/4/2022<br>First Used 5/2013 | (Int'l Class: 25)<br>Bandanas; Beachwear; Belts; Blazers; Blouses; Bodysuits; Camisoles; Coats; Dresses; Footwear; Gloves; Headwear; Jackets; Jeans; Jumpsuits; Kimonos; Leggings; Lingerie; Loungewear; Pants; Robes; Rompers; Scarves; Shirts; Shorts; Skirts; Sleepwear; Socks; Sweaters; Sweatshirts; Swimwear; T-shirts; Tights; Tops as clothing; Underwear; Vests |
| SHEIN<br>RN: 6861757<br>SN: 88107571<br><br>Registered 10/4/2022<br>First Used 5/2013 | (Int'l Class: 35)<br>On-line retail store services featuring clothing, clothing accessories, hair accessories, bags, purses, footwear, headwear, jewelry, sunglasses, belts for clothing, makeup, bedding, and cell phone cases and accessories |
| SHEIN (Stylized)<br><br>**SheIn**<br><br>RN: 5256688<br>SN: 86526588<br><br>Registered 8/1/2017 | (Int'l Class: 14)<br>Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; brooches; watches; hat ornaments of precious metal; pins being jewelry<br>(Int'l Class: 18)<br>Wallets; handbags; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel utensils made of leather, namely, travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases; string bags for shopping<br>(Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; T-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers, |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| First Used 5/10/2013 | shorts; shoes; flats; pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats<br>(Int'l Class: 26)<br>Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; Bobby pins; hat ornaments not of precious metal<br>(Int'l Class: 35)<br>Online retail store services in the fields of clothing, accessories, footwear, and jewelry |

5.      The term the "Imposter Twitter Accounts" refers to any Twitter accounts that make use of SHEIN Marks in their account handles—including, at a minimum, @SHEIN_NYC, @SHEIN_DC, @SHEIN_USA_.

6.      "Document" has the same broad meaning as used in the Federal Rules of Civil Procedure, and includes, without limitation, any thing or any written or graphic matter or any medium of any type or description upon which information is recorded, or from which information can be perceived, including computer, electronic, magnetic and optical media of all kinds.

7.      "Person" or "persons" shall mean an individual, corporation, proprietorship, partnership, association, or any other entity.

8.       "Relating to" or "related to" when referring to any given subject matter shall mean, without limitation, any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

## **Documents to be Produced**

1.      All data reflecting the use, ownership and operation of the Imposter Twitter Accounts, including but not limited to all names, addresses, phone numbers, and/or email addresses maintained in association with the Imposter Twitter Accounts, and all IP addresses used to access those accounts.

2.      All posts, including deleted posts, made by the Imposter Twitter Accounts, and the data relating to such posts, including likes, retweets, and comments made on those posts.

3.      Any direct messages, including deleted messages, sent or received by the Imposter Twitter Accounts.

4.      Documents sufficient to identify any other Twitter user accounts owned and/or operated by the same customer(s) who created and/or operated the Imposter Twitter Accounts, including deleted accounts.

EXHIBIT "O"

# UNITED STATES DISTRICT COURT

for the
Northern District of Illinois

| | | |
|---|---|---|
| **ROADGET BUSINESS PTE. LTD.** | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-07119 |
| | ) | |
| **WHALECO, INC.** | ) | |
| _____ | ) | |
| *Defendant* | ) | |
| | ) | |

## AFFIDAVIT OF SERVICE

I, Joecelyn Ramos, being duly sworn, state:

I am over the age of 18 and not a party to this action. I am an authorized process server under the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004.

I served the following documents on Twitter, Inc in Los Angeles County, CA on February 14, 2023 at 7:51 am at 330 North Brand Boulevard, Suite 700, Glendale, CA 91203 by leaving the following documents with Daisy Montenegro who as Intake Specialist at Ct Corporation is authorized by appointment or by law to receive service of process for Twitter, Inc.

Cover Letter, Order Granting Third Party Expedited Discovery, and Subpoena

Additional Description:
I delivered the documents to Daisy Montenegro, Intake Specialist, for the Registered Agent company CT Corporation.

Hispanic or Latino Female, est. age 30, glasses: N, Brown hair, 140 lbs to 160 lbs, 5' to 5' 3".
Geolocation of Serve: http://maps.google.com/maps?q=34.1517028809,-118.2544770653
Photograph: See Exhibit 1

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

/s/ Joecelyn Ramos

Executed in   Los Angeles County          ,

   CA      on    2/15/2023         .

Signature
Joecelyn Ramos
(818) 356-6146
Chicago PI Services Group LLC
No. 117.001738

# Exhibit 1



Exhibit 1a)

EXHIBIT "P"

# WHITE & CASE

February 23, 2023

White & Case LLP
555 South Flower Street
Suite 2700
Los Angeles, California 90071-2433
**T** +1 213 620 7700

**whitecase.com**

<u>VIA MAIL AND EMAIL</u>

David Stein, Esq. (dstein@masudafunai.com)
Masuda, Funai, Eifert & Mitchell, Ltd.
203 N. LaSalle St., Ste. 2500
Chicago, IL 60601

Re:     ***Roadget Bus. Pte Ltd. v. Whaleco, Inc.,*** **No. 1:22-cv-07119 (N.D. Ill.) –   Subpoena**

Dear Counsel:

We represent Twitter, Inc. ("Twitter").  We are in receipt of the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena") that you served on behalf of the Plaintiff in connection with the above-referenced action.   In accordance with applicable rules, including the Federal Rules of Civil Procedure, Twitter responds to the Subpoena and the document requests ("Requests") in the Subpoena as follows:

## <u>General Objections</u>

1.     The following responses are based on information currently available to Twitter.  These responses are given without prejudice to Twitter's right to produce or rely on subsequently discovered information.

2.     Twitter reserves the right to amend, supplement, or otherwise modify its responses and interpose objections not asserted herein.  Twitter's failure to include any objection to the Requests or any particular definition is neither intended as, nor shall in any way be deemed, a waiver of Twitter's right to assert that or any other objection.

3.     Twitter objects to the Subpoena on the ground that you have provided Twitter fewer than 14 days to respond to the Subpoena.  Twitter received your subpoena seeking records related to a Twitter user's account on February 14, 2023, with a production date of February 24, 2023. Such a truncated return period is unreasonable given Twitter's size and the volume of legal process that it receives.

4.     Twitter objects to each Request to the extent they seek documents not in Twitter's possession, custody, or control.

**WHITE & CASE**

February 23, 2023

5.    Twitter objects to all definitions, instructions, and Requests that purport to impose obligations on Twitter that are different from, in addition to, or greater than those set forth in the Federal Rules of Civil Procedure.

6.    Twitter further objects to the terms "SHEIN Marks," "Imposter Twitter Accounts," "account handles," "at a minimum," "document," "relating to," "related to," "data," "reflecting," "use, ownership and operation," "maintained in association," "accounts," "IP addresses," "posts," "likes, retweets, and comments made," "direct messages," "sent or received," "sufficient to identify," "same customer(s)," "created," and "deleted accounts," on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought in the Request is unclear.

7.    Twitter objects to the Requests to the extent they exceed the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.* ("SCA"), and to the extent they seek the content of a user's electronic communications, such as messages, posts, comments, photos, or videos, because such a request is barred by the SCA.  The SCA does not permit private parties to compel production of the content of a user's electronic communications from service providers such as Twitter by service of a subpoena or court order, and there is no exception for civil discovery demands.  18 U.S.C. §§ 2702(a)(1), (2); 2702(b)(1)-(8); *see also Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 730 (9th Cir. 2011) (holding that non-governmental entities may not obtain communications content with a civil discovery demand because it would "invade[] the specific interests that the [SCA] seeks to protect."); *O'Grady v. Superior Court*, 139 Cal. App. 4th 1423, 1441-47 (2006) (holding that the SCA bars civil litigants from obtaining communications content from a service provider).  Such requests must be directed to the user or other non-provider entities.  Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents.  Various tools are available to help users access and download their information.  Descriptions of these tools are available in Twitter's Help Center (https://help.twitter.com/en/managing-your-account/accessing-your-twitter-data).

8.    Twitter further objects to the Subpoena because you have provided no documentation demonstrating that the Court considered and imposed the First Amendment safeguards required before a litigant may be permitted to unmask the identity of an anonymous speaker. *See Smythe v. Does 1-10*, No. 15-mc-80292-LB, 2016 WL 54125 (N.D. Cal. Jan. 5, 2016) (denying the motion to enforce a subpoena against Twitter where movant failed to overcome user's First Amendment right to anonymous speech).  Before a subpoena can issue to a service provider like Twitter for information regarding the identity of an anonymous internet user, the party seeking the information must first "persuade[] the court that there is a real evidentiary basis for believing that the defendant has engaged in wrongful conduct that has caused real harm to the interests of the plaintiff." *Music Grp. Macao Com. Offshore Ltd. v. Does*, 82 F. Supp. 3d 979, 983 (N.D. Cal. 2015) (citing *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 975-76 (N.D. Cal. 2005)); *see also Krinsky v. Doe 6*, 159 Cal. App. 4th 1154 (2008) (explaining that a plaintiff seeking to unmask an anonymous speaker must (1)

2

WHITE & CASE

make a reasonable effort to notify the defendant that they are the subject of a subpoena; (2) make a prima facie showing of the elements of defamation; and (3) make clear to the court that the discovery of defendants' identity is necessary to pursue plaintiff's claim). It is unclear here whether the Court has issued an order with the requisite First Amendment findings.

9.   This deficiency is not cured by the fact that your subpoena has been authorized by a judge. The SCA only permits the issuance of court orders in criminal cases, *see* 18 U.S.C. § 2703(d), and even in criminal cases, a search warrant based on probable cause, rather than a subpoena or court order, is required to compel the production of content. *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (holding compelled production of content requires a search warrant). Further, the order is also objectionable to the extent it was issued without advance notice to Twitter or an opportunity for Twitter to be heard.

10.   Twitter further objects to the Requests to the extent they seek information that is more properly obtained by issuing discovery requests directly to a party in this action. Litigants have an obligation to avoid imposing an undue burden on non-parties, and non-party discovery should therefore occur only if the information is not available through discovery from the parties to the litigation themselves. *See* Fed. R. Civ. P. 45(d)(1), (d)(3)(A)(iv). Indeed, a party "must first establish that it cannot obtain the discoverable information from its party-opponent before subpoenaing those documents from a non-party." *In re CareSource Mgmt. Grp. Co*., 289 F.R.D. 251, 254 (S.D. Ohio 2013). Twitter does not have an "obligation to determine which documents have, or have not, been produced to" parties to the litigation. *Id*. Thus, courts have routinely held that parties should not attempt to seek documents from non-parties that are available to, or in possession of, a party to the litigation. *See, e.g.*, *Breuder v. Bd. of Trs., No. 15 CV 9323,* 2020 U.S. Dist. LEXIS 144272, at *7 (N.D. Ill. Aug. 12, 2020) ("Indeed, generally speaking, non-parties are not required to produce documents that have or can be obtained from a party in discovery."); *Tresóna Multimedia, LLC v. Legg, No. 15 C 4834,* 2015 U.S. Dist. LEXIS 107723, at *9 (N.D. Ill. Aug. 17, 2015) ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."); *Craigville Tel. Co. v. T-Mobile United USA, Inc., No. 19 CV 7190, 2022 U.S. Dist. LEXIS 226705, at *12 (N.D. Ill. Dec. 16, 2022)* ("The Court is not inclined to subject a nonparty to unduly burdensome discovery for information that is, for the most part, readily available from a party.").

11.   Twitter further objects to the Requests to the extent that you purport to know or suspect who controls a targeted account. You may obtain the information you seek by issuing a discovery request directly to that person, who is not subject to the SCA's provisions. Courts have recognized that a request for production directly to the user is the appropriate way to obtain the content of a litigant's electronic communications. *See, e.g.*, *Suzlon,* 671 F.3d at 731 (noting that the inability to obtain documents from a provider does not affect the ability to obtain the documents directly from the user); *O'Grady*, 139 Cal. App. 4th at 1446 (holding that a discovery request for content must be directed to the user). This is consistent with your duty to avoid imposing an undue burden on nonparties such as Twitter, and nonparty discovery can occur only if the information sought is not available through discovery from

3

WHITE & CASE

the parties to the litigation themselves. *See, e.g.*, Fed. R. Civ. P. 45(d)(1); *Suzlon*, 671 F.3d at 731; *Calcor Space Facility, Inc. v. Superior Court*, 53 Cal. App. 4th 216, 225 (1997) (holding that "[a]s between parties to litigation and nonparties, the burden of discovery should be placed on the latter only if the former do not possess the material sought to be discovered.").

12.   Twitter objects to your Subpoena to the extent that it expressly seeks deleted content because, to the extent any such data exists, it is not reasonably accessible. *See United States v. Amerigroup Ill., Inc.*, No. 02 C 6074, 2005 WL 3111972, at *3-7 (N.D. Ill. Oct. 21, 2005) (restoration of deleted content constitutes an "undue burden," and nonparties are not subject to the significant burden of restoring such data.).

13.   Twitter objects to the Subpoena on the ground that it fails to specify a time period, making the Request overbroad and unduly burdensome. *See, e.g., Art Akiane LLC v. Art & SoulWorks LLC,* No. 19 C 2952, 2021 U.S. Dist. LEXIS 214738, at *12-13 (N.D. Ill. Nov. 5, 2021) ("[C]ompletely open-ended discovery requests without time limitations rarely, if ever, withstand scrutiny.")

14.   Twitter objects to the Requests to the extent they seek protected or privileged information, including information protected by the attorney-client privilege, work product doctrine, or other applicable privilege, or confidential, proprietary, or trade secret information. Twitter does not intend to disclose any protected material. Any disclosure of protected materials is inadvertent and should not be construed as a waiver of any applicable privilege or protection.

15.   Twitter objects to the Subpoena to the extent it calls for information to be produced in a form or manner other than that kept by Twitter in the usual course of its business.

16.   Twitter notes that according to its policies it will give notice to an impacted user before producing basic subscriber information.

17.   These general objections shall apply to each response, and the general objections shall be deemed as continuing as to each Request and are not waived, or limited, by Twitter's specific objections and responses.

## Specific Responses and Objections

**Document Request No. 1:**

All data reflecting the use, ownership and operation of the Imposter Twitter Accounts, including, but not limited to, all names, addresses, phone numbers, and/or email addresses maintained in association with the Imposter Twitter Accounts, and all IP addresses used to access those accounts.

**Response to Document Request No. 1:**

In addition to the foregoing objections, Twitter objects to the terms "data," "reflecting," "use, ownership and operation," "Imposter Twitter Accounts," "maintained in association," "accounts,"

WHITE & CASE

February 23, 2023

"access" and "IP addresses," on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought in the Request is unclear.

Twitter further objects to this Request to the extent it seeks information that should be directed to the user or other non-provider entities. Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents. Various tools are available to help users access and download their information. Descriptions of these tools are available in Twitter's Help Center (https://help.twitter.com/en/managing-your-account/accessing-your-twitter-data).

Twitter further objects to this Request to the extent that it seeks information that is more properly obtained by issuing discovery requests directly to a party in this action.

Twitter further objects to the Request to the extent it exceeds the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*, and to the extent it seeks information that is prohibited from disclosure and/or is not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*

Twitter further objects to the Subpoena because you have provided no documentation demonstrating that the Court considered and imposed the First Amendment safeguards required before a litigant may be permitted to unmask the identity of an anonymous speaker.

Twitter further objects on the basis that all legal process must properly identify the Twitter account at-issue by providing the @username and/or URL of the subject Twitter account in question (e.g., @safety and https://twitter.com/safety). Twitter has more than 300 million users, making it impossible to ensure that searches based on name, date of birth, address, or like information accurately identify the correct records. The Request purports to use such information in seeking to ask Twitter to search for and produce "data" regarding any alleged "names, addresses, phone numbers, and/or email addresses *maintained in association* with the Imposter Twitter Accounts" (emphasis added) and moreover, seemingly asks for information regarding such alleged "names, addresses, phone numbers, and/or email addresses" without providing a username or URL.

Subject to and without waiving these objections, Twitter responds as follows: Twitter will not produce documents in response to this Request.

**Document Request No. 2:**

All posts, including deleted posts, made by the Imposter Twitter Accounts, and the data relating to such posts, including likes, retweets, and comments made on those posts.

**Response to Document Request No. 2:**

In addition to the foregoing objections, Twitter objects to the terms "posts," "deleted posts," "Imposter Twitter Accounts," "data relating to such posts," and "likes, retweets and comments,"

5

February 23, 2023

**WHITE & CASE**

on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought in the Request is unclear.

Twitter further objects to this Request to the extent it seeks information that should be directed to the user or other non-provider entities.  Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents.  Various tools are available to help users access and download their information.  Descriptions of these tools are available in Twitter's Help Center.

Twitter further objects to this Request to the extent that it seeks information that is more properly obtained by issuing discovery requests directly to a party in this action.

Twitter further objects to the Request to the extent it exceeds the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*., including the SCA, 18 U.S.C. §§ 2701 *et seq*., and to the extent it seeks information that is prohibited from disclosure and/or is not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*., including the SCA, 18 U.S.C. §§ 2701 *et seq*.

Twitter further objects on the basis that all legal process must properly identify the Twitter account at-issue by providing the @username and/or URL of the subject Twitter account in question (e.g., @safety and https://twitter.com/safety).  Twitter has more than 300 million users, making it impossible to ensure that searches based on name, date of birth, address, or like information accurately identify the correct records.  The Request purports to use such information in seeking to ask Twitter regarding any alleged "data relating to such posts" (emphasis added) and moreover, seemingly asks for information regarding such alleged "data relating to such posts" without providing a username or URL.

Twitter further objects to this Request to the extent that it expressly seeks deleted content because, to the extent any such data exists, it is not reasonably accessible.

Subject to and without waiving these objections, Twitter responds as follows: Twitter will not produce documents in response to this Request.

**Document Request No. 3:**

Any direct messages, including deleted messages, sent or received by the Imposter Twitter Accounts.

**Response to Document Request No. 3:**

In addition to the foregoing objections, Twitter objects to the terms "direct messages," "deleted messages," "sent," "received," and "Imposter Twitter Accounts," on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought in the Request is unclear.

6

WHITE & CASE

February 23, 2023

Twitter further objects to this Request to the extent it seeks information that should be directed to the user or other non-provider entities. Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents. Various tools are available to help users access and download their information. Descriptions of these tools are available in Twitter's Help Center.

Twitter further objects on the basis that all legal process must properly identify the Twitter account at-issue by providing the @username and/or URL of the subject Twitter account in question (e.g., @safety and https://twitter.com/safety). Twitter has more than 300 million users, making it impossible to ensure that searches based on name, date of birth, address, or like information accurately identify the correct records. The Request purports to use such information in seeking to ask Twitter regarding any alleged "data relating to such posts" (emphasis added) and moreover, seemingly asks for information regarding such alleged "data relating to such posts" without providing a username or URL.

Twitter further objects to this Request to the extent that it expressly seeks deleted content because, to the extent any such data exists, it is not reasonably accessible.

Twitter further objects to this Request to the extent that it seeks information that is more properly obtained by issuing discovery requests directly to a party in this action.

Twitter further objects to the Request to the extent it exceeds the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*, and to the extent it seeks information that is prohibited from disclosure and/or is not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, including the SCA, 18 U.S.C. §§ 2701 *et seq.*

Subject to and without waiving these objections, Twitter responds as follows: Twitter will not produce documents in response to this Request.

**Document Request No. 4:**

Documents sufficient to identify any other Twitter user accounts owned and/or operated by the same customer(s) who created and/or operated the Imposter Twitter Accounts, including deleted accounts.

**Response to Document Request No. 4:**

In addition to the foregoing objections, Twitter objects to the terms "documents," "sufficient to identify," "other Twitter user accounts," "owned and/or operated," "same customer(s)," "created and/or operated," "Imposter Twitter Accounts," and "deleted accounts," on the basis that these terms are vague and ambiguous, overbroad, and unduly burdensome, as the scope of materials sought in the Request is unclear.

7

WHITE & CASE

February 23, 2023

Twitter further objects to this Request to the extent it seeks information that should be directed to the user or other non-provider entities. Active users can log into their accounts at any time to preserve, collect, produce, and authenticate their account contents. Various tools are available to help users access and download their information. Descriptions of these tools are available in Twitter's Help Center.

Twitter objects to your Subpoena to the extent that it expressly seeks deleted content because, to the extent any such data exists, it is not reasonably accessible.

Twitter further objects to this Request to the extent that it seeks information that is more properly obtained by issuing discovery requests directly to a party in this action.

Twitter further objects to the Request to the extent it exceeds the scope of basic subscriber information that Twitter may permissibly produce under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*., including the SCA, 18 U.S.C. §§ 2701 *et seq*., and to the extent it seeks information that is prohibited from disclosure and/or is not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*., including the SCA, 18 U.S.C. §§ 2701 *et seq*.

Twitter further objects to the Subpoena because you have provided no documentation demonstrating that the Court considered and imposed the First Amendment safeguards required before a litigant may be permitted to unmask the identity of an anonymous speaker.

Twitter further objects on the basis that all legal process must properly identify the Twitter account at-issue by providing the @username and/or URL of the subject Twitter account in question (e.g., @safety and https://twitter.com/safety). Twitter has more than 300 million users, making it impossible to ensure that searches based on name, date of birth, address, or like information accurately identify the correct records. The Request purports to use such information in seeking to ask Twitter to search for any alleged "[d]ocuments sufficient to identify any other Twitter user accounts owned and/or operated by the same customer(s)" and moreover, seemingly asks for such information without providing a username or URL.

Subject to and without waiving these objections, Twitter responds as follows: Twitter will not produce documents in response to this Request.

\*\*\*

8

WHITE & CASE

February 23, 2023

Based on at least the foregoing objections, Twitter will not be producing any data in response to your Subpoena.  Please do not hesitate to contact me if you have any questions.  Twitter otherwise preserves and does not waive any other available objections or rights.

Sincerely,

**Jon Hawk**
**T** +(213) 620-7741
**E** jhawk@whitecase.com

9

# GROUP EXHIBIT "Q"

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Monday, May 15, 2023 4:31 PM
**To:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

We provided our SCA authorities long ago, and the arguments you finally provided on Friday, and cases citing to data such as IP addresses that we already provided as part of BSI, didn't change anything we already showed, nor did the arguments in your email even address the concept of the prohibition against producing content in response to a civil subpoena. It rather appears you're conflating the concept of content with the very separate concept of BSI. There is this nothing further to discuss.

Jon

**From:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Date:** Monday, May 15, 2023 at 2:24 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

We disagree with your characterizations of the previous meet and confers, including the agreements allegedly reached during them. We also disagree with your assertion that we are not entitled to the data for Request Nos. 2-3. We provided authorities showing that we are entitled to such data. We did so at your insistence because you refused to ask your client a simple question about whether they had any responsive data in the first place and because you claimed

1

that you needed authorities from us to be able to engage in a meet and confer. Yet, once we provided those authorities, you did not bother to discuss further, simply stating, without explanation, that our position is incorrect.

We understand that any further attempt to resolve this without Court intervention is futile. We will proceed accordingly.

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

---

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Monday, May 15, 2023 3:53 PM
**To:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jiwon,

Your email is the latest efforts by your client to improperly change the scope of the subpoena requests and / or the agreements we've reached during meet and confer discussions. Your client's efforts -- including on multiple occasions imposing artificial, short deadlines to respond after your client went silent for weeks -- fall far short of the good faith efforts required during meet and confers. And yet despite this, Twitter has gone to incredible efforts and beyond its obligations to continue to seek informal resolution of these issues, where your client has made improper and ever-changing demands, and those demands have, in part, been premised on your repeated refusals to provide any legal support for your positions despite Twitter having provided citations to valid case law and explanations thereunder as to why certain of your requests are legally improper and cannot be complied with.

Twitter hereby reiterates and stands on all of its objections that it has asserted in its written responses, that I have explained to you and Dave on our VCs (including those you've acknowledged but later attempted to disregard), and that I have likewise explained in our written correspondence. The below is provided without waiving any of those objections, and without waiving Twitter's ability to enforce our agreements reached during our meet and confers, which you have nonetheless sought to ignore via subsequent requests:

- No. 1 -- to recap, Twitter produced the BSI it has for the accounts. I've explained this to you and Dave before. After we produced that data, your meet and confer efforts focused on only no. 4. Then, after a VC to discuss only no. 4, where Dave attempted to change the scope of the subpoena to disregard the plain language of that request, Dave's subsequent email sought to open also nos. 2 and 3, and as with no. 4 to again change their scope beyond what can reasonably be construed from the subpoena and / or to misconstrue the SCA (apparently without having reviewed the case law we've cited and explained to you). As part of this, and only via email after our VC, you asked us to confirm whether Twitter had other names in the BSI for the accounts (beyond the names already included in the data that was produced), and whether Twitter had physical addresses in the BSI for the account holders. I'd already told you we'd produced the BSI Twitter had, and I'd previously explained that BSI does not include physical addresses.

This email nonetheless again confirms for you that there are no other names in the BSI, and again confirms for you there are no physical addresses. We are, and have been, done with request no. 1.

- No. 4 -- Twitter is standing on its objection both to the request as written in the subpoena, how Roadget has since attempted (inappropriately and invalidly) to wholesale re-draft it to ask for something entirely different in meet and confer discussions, and how Roadget has agreed that if we responded to its last request here as to email addresses, this request would be concluded (which we did, but Roadget has disregarded via your email below).

   Nonetheless, Twitter has checked and does not see any other accounts associated with the phone numbers in the BSI we provided you. As with my last email, there is nothing else to discover here. We are, and have been, done with request no. 4.

- Nos. 2 and 3 -- your purported analysis of the SCA below, which has finally been provided after my previous four requests made over a period of weeks, is incorrect and provides no support for your positions. There is case law, including that which we've cited, establishing this. You are not entitled to the data you seek with regard to nos. 2 and 3, and the SCA is clear in that. Twitter stands on its objections.

This is Twitter last attempt at resolving this for the reasons already explained. If Roadget is not satisfied, it can bring its motion, and Twitter will seek its attorney fees for having to oppose an unjustified motion.

Jon

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Sent:** Friday, May 12, 2023 2:52 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

We have some follow-up questions for Request Nos. 1 and 4. For **Request No. 1**, please let us know if you have any physical addresses associated with the Imposter Twitter Accounts. You mentioned in your previous email that Twitter did not have any other names for the accounts, but you did not provide a response regarding the addresses. If Twitter produces the physical addresses or confirms that it does not have them, we will be done with Request No. 1.

For **Request No. 4**, you stated in your email below that Twitter does not see any other accounts associated with the email addresses in the BSI that it provided us. Can Twitter also check and confirm whether there are any accounts associated with the Chinese phone numbers it provided? If Twitter confirms that it has no accounts associated with those Chinese phone numbers, we would also be done with Request No. 4.

For Request Nos. 2-3, again,  I do not understand why it was, and is, so difficult for Twitter to tell us whether it has data responsive to these requests. Twitter simply needed to say "yes" or "no." If the answer was no, then we could have avoided arguing over the SCA altogether and saved both our clients time and cost. But, since you insist on exchanging arguments and authorities before we even know if there is any responsive data to be fighting about, we provide the following authorities in a final effort to meet and confer on these requests:

**Request No. 2**: This request asks for all posts made by the Imposter Twitter Accounts and data relating to such posts. You previously represented that Twitter does not maintain deleted posts or data related to the same. We are therefore seeking all posts that have not been deleted and data that relates to such posts.

Your SCA objection is baseless because an SCA exception applies here. The SCA states that a provider "may divulge the contents of a communication . . . to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. 2702(b)(1). Assuming that Twitter posts constitute a "communication," the entire Twitterverse is the intended recipient of the posts. Twitter account users have no legitimate privacy interest in public tweets posted by accounts they created using identifying information that they publicly disclosed to a third party. *See, e.g., In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 714 (N.D. Cal. 2011) (holding that plaintiff could not state a claim under the SCA against Facebook where plaintiff alleged that communication at issue was sent to Facebook and/or advertisers, which would have been intended recipients), *aff'd*, 572 F. App'x 494 (9th Cir. 2014). We are entitled to the Twitter posts and related data to the extent that they have not been deleted.

**Request No. 3**: This request asked for any direct messages sent or received by the Imposter Twitter Accounts. The information we were primarily interested in obtaining by way of Request No. 3 was account information for the recipients of any direct messages sent by the Imposter Twitter Accounts. We are willing to limit the scope of Request No. 3 to such account information.

The SCA permits Twitter to produce the account information. The SCA provides that "a provider . . . may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2)) . . . with the lawful consent of the customer or subscriber . . . or to any person other than a governmental entity." SCA, 18 U.S.C. 2702(c)(2), (6).  The SCA's prohibition against the disclosure of the contents of a communication does not apply to the account information requested. *See, e.g.*, *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107-09 (9th Cir. 2014) (individual's Facebook ID and the url of the webpage individual was viewing were not contents of a communication); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078 (N.D. Cal. 2018) (IP address and unique Lyft driver ID were not contents of a communication within meaning of SCA).

Our client is a non-governmental entity. Additionally, Twitter has the lawful consent of its users to divulge the account information requested. All U.S. and China-based Twitter account owners (users of the service) must consent to Twitter's Terms of Service ("Terms"). Twitter's Terms expressly provide that Twitter "***reserve[s] the right to . . . disclose any information as we reasonably believe is necessary to*** (i) ***satisfy any applicable law, regulation, legal process, or governmental request,*** (ii) enforce the Terms, including potential violations hereof, (ii) ***detect, prevent, or otherwise address fraud***, security or technical issues, (iv) respond to user support, or (v) ***protect the rights, property or safety of Twitter, its users and the public.***" **https://twitter.com/en/tos**

The Terms also expressly incorporate Twitter's privacy policy (https://twitter.com/en/privacy), which states:

> We use information we collect to provide for the safety and security of our users, our products, services, and your account. This includes verifying your identity, authenticating your account, and ***defending against fraud, unauthorized use, and illegal activity.*** We also use the information to evaluate and affect the safety and quality of content on Twitter - this includes investigating and enforcing our policies and and [sic] terms, as well as applicable law.

> The Privacy Policy also notifies users that "heads up: Tweets can end up on the news or a search engine"

> 3.1 When you Tweet, post, and share.

**With the general public.** *You are directing us to disclose that information as broadly as possible.* Twitter content*, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public.* The public does not need to be signed in to view much of the content on Twitter. They may also find Twitter content off of Twitter, for example from search query results on Internet search engines.

 3.3 When required by law, to prevent harm, or in the public interest.

We may preserve, use, share, or *disclose your information if we believe it is reasonably necessary* to:

>   *comply with a law, regulation, legal process, or governmental request;*

>   protect the safety of any person, protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services (e.g. for violation of Twitter Rules);

>   explain why we have removed content or accounts from our services (e.g., for a violation of <u>Twitter Rules</u>);

>   *address fraud*, security, or technical issues; or

>   protect our rights or property, or *the rights or property of those who use our services.*

Accordingly, for all of these reasons, we are entitled to the account information for the recipients of any direct messages sent by the Imposter Twitter Accounts.

Please let us know by **next Tuesday** whether Twitter is willing to provide supplemental information and/or production for any of the requests, or if Twitter will stand on its objections. We will then proceed accordingly.

Thanks,

Jiwon


**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
<u>JYhee@masudafunai.com</u> | <u>www.masudafunai.com</u>



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Hawk, J. Jonathan <<u>jhawk@whitecase.com</u>>
**Sent:** Friday, May 5, 2023 3:56 PM
**To:** Jiwon Yhee <<u>JYhee@MasudaFunai.com</u>>
**Cc:** Kuethman, Kathryn <<u>kathryn.kuethman@whitecase.com</u>>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jiwon, it's not reasonable in a meet and confer for you to flatly refuse several times to provide authorities or any support for your position when you've been presented with case law conclusively showing that, under federal law, Roadget cannot obtain from Twitter certain items that it's seeking. I've now asked three times, and not once have you engaged in a good faith meet and confer effort on those points (nos. 2 and 3). I take your refusal to provide a single authority supporting your position on those points as an admission that no such authority exists. Nor is it reasonable to have a VC to meet and confer on a single item (no. 4) as we did, and then come back with an email re-opening items that had long been closed, and demanding a response on a few days notice when Roadget went silent on this matter for weeks. Twitter's final positions are below:

- No. 1 -- Twitter provided the BSI it has for the accounts, including username and accountdisplayname. There are no other names in the BSI.

- Nos. 2 and 3 -- Twitter is standing on its SCA objections as set forth in its response to the subpoena, which includes citations to statutory authority and case law showing that Twitter in response to a civil subpoena cannot produce content such as that sought by Roadget. I'll note again that, in response to Dave re-opening these previously-closed issues and demanding Twitter produce, I asked him if Roadget's counsel has read the SCA case law cited in Twitter's response to the objection, and asked for any authorities supporting the position that -- as advanced by your side (albeit incorrectly) -- there is an exception to the SCA's prohibition against producing content in the context of civil trademark matters. I've now asked three times (and this being a fourth) for any such support, and there's been no confirmation that Roadget's counsel has read the authorities we've cited, no discussion from Roadget whatsoever of the principles set forth in those cases, nor provision of any support for Roadget's position that it can seek content from Twitter in response to a civil subpoena.

- No. 4 -- Twitter is standing on its objection both to the request as written in the subpoena, and how Roadget has since attempted (inappropriately and invalidly) to wholesale re-draft it to ask for something entirely different in meet and confer discussions. Nonetheless, Twitter has checked and does <u>not</u> see any other accounts associated with the email addresses in the BSI we provided you. There is nothing else to discover here.

Jon

**J Jonathan Hawk**  |  Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP  |  555 South Flower Street, Suite 2700  |  Los Angeles, CA 90071-2433

**From:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Sent:** Thursday, May 4, 2023 4:23 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

I am simply trying to see whether there is a need to even discuss Requests No. 2-3. If Twitter doesn't maintain responsive data, then we would be done with those requests.

You already said on a call that Twitter doesn't have some of what we are asking for in those requesrs. Does Twitter maintain any materials that would be responsive? Or are we arguing over nothing? I don't think this is unreasonable for me to ask. And it would be simple for Twitter to answer.

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**

TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, May 4, 2023, 6:08 PM
**To:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jiwon, I don't understand why as part of a meet and confer -- when we've provided case law showing we can't produce a certain type of data you're requesting in item nos. 2 and 3 -- you won't respond to my request for authority that (as Dave represented) says otherwise and that I'm now requesting you provide for a third time?

Jon

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741    **M** +1 626 755 1400    **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Sent:** Thursday, May 4, 2023 4:02 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Thanks, Jon. Let me know once you're able to re-discuss Twitter on Request No. 4 and check whether you have names and addresses for Request No. 1. We can set up a call.

For Requests No. 2-3, could you let us know if Twitter has responsive data? There is is little point in us going back and forth over these requests if Twitter does not maintain the requested data and cannot produce it as a result. On one of our calls, you mentioned that Twitter does not maintain deleted accounts/content, so at least some of what we are asking for in Requests No. 2-3 does not appear to be available to Twitter. Could you shed some light on what Twitter has or does not have, so that we are not discussing these requests in the abstract?

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com

CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, May 4, 2023 5:18 PM
**To:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jiwon,

There are now so many moving pieces it may be easier to hop on a call and understand what is at-issue. Re nos. 2-3, there is nothing to argue about as those are very clearly covered by the SCA (the case law we cited in our objection is only part of that body of law, but quite instructive and worth a read). Since we've provided authority on this point, I'd asked Dave on the thread below for authority supporting his position that there is some exception to the SCA for civil trademark claims (which there isn't). I haven't heard back on that. If you have any such authority, please provide it and I'll consider it.

Re no. 4, I'll re-discuss with Twitter. I explained our issues on the VC. I'll re-check with Twitter, but I'll also note in the interim that the characterization in Dave's email below as to the scope of no. 4 doesn't match what the subpoena actually asks for (which was one of the things I explained in our VC).

Re no. 1, the data included a number of other data points include email address, etc. I believe we produced what we had but I'll double check.

I'll revert on our further positions re nos. 1 and 4. I believe as to nos. 2 and 3, it's now to you to provide some authority that addresses our very serious and well-supported SCA concerns, as backed-up by case law cited and explained in our objections.

Jon

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** Jiwon Yhee <JYhee@MasudaFunai.com>
**Sent:** Thursday, May 4, 2023 3:06 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

Any updates on the below?

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Jiwon Yhee
**Sent:** Wednesday, May 3, 2023 4:17 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

Sorry to spam your inbox, but, in addition to the questions about Requests No. 2-4 in my Monday email, I had a few questions regarding Request No. 1. For Request No. 1, Twitter provided Chinese phone numbers and email addresses for the Imposter Twitter Accounts, but Twitter did not provide the names or addresses of those individuals. Does Twitter have that information, and, if yes, is it willing to produce it?

Thanks,

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Jiwon Yhee
**Sent:** Wednesday, May 3, 2023 2:48 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

Following up on my email below.

Thanks,

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Jiwon Yhee
**Sent:** Monday, May 1, 2023 9:59 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>; David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FIDX762256]

Jon,

Apologies for our delayed response. David has transitioned to a new position at GT, so I will be taking this across the finish line. I look forward to working with you.

Our primary point of dispute right now is Request No. 4. Would Twitter be willing to provide documents for that request, or will it stand on its objections? Is anything that we could do that may help Twitter decide to produce responsive documents?

For Request Nos. 2-3, can you please confirm whether Twitter actually has any data responsive to those requests? We do not believe that the parties should be arguing in the abstract about that data if Twitter no longer maintains it and cannot produce it.

Thanks,

Jiwon

**Jiwon Yhee** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7500 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
JYhee@masudafunai.com | www.masudafunai.com



**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, Jiwon Yhee, at 312.245.7500.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 27, 2023 3:10 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Your latest follow up and our meet and confer discussion earlier this week was only as to item 4 in the subpoena. Are you now trying to re-open items 2 and 3 as well without having discussed them earlier this week? Also, have you reviewed the case law on the SCA in particular with regard to items 2 and 3? I'm very surprised that you think the SCA doesn't apply to what is very clearly content, and would be interested in understanding why you think there's an

exception to the SCA in the civil context for trademark infringement (as well as any citation you can provide me that supports such a position).

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 27, 2023 12:26 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi Jon,

Thanks for your time earlier this week. We have spoken to the client and their position is as follows.

Regarding your objections to requests 2, 3, and 4, that there are SCA concerns, we reject this objection because the materials sought under the subpoena relate solely to the infringement of Shein's valuable trademark and copyright protections in its intellectual property. Accordingly, Twitter cannot hide behind the SCA in this respect.

Further, regarding your similar first amendment objections, there would be no unmasking of individual identities through the information sought in the subpoena. Rather, we are simply seeking the content related to the infringement alleged in the Amended Complaint, as set forth above. Finally, and specifically as it relates to request number 4 and the request to search for accounts registered with the same e-mail addresses as the imposter accounts, we again reject the premise that any SCA or first amendment concerns are present. The e-mail addresses that you provided already demonstrate that these e-mails are being used for an improper imposter purpose, and Shein is entitled to the additional information requested to allow it to continue to pursue the bad actors here.

Please advise by Monday whether Twitter will make any further production, or whether it will stand on its objections, and then we will proceed accordingly.

As I also advised, I am starting a new position as of Monday, May 1, and so please direct your further correspondence on this to Ms. Yhee, who will be taking over primary handling from this point forward.

Regards,
David Stein

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Monday, April 24, 2023 4:34 PM
**To:** David J. Stein <DStein@MasudaFunai.com>

**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Are you free to connect tomorrow around 8 am Pacific?

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 20, 2023 1:30 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Jon,

Just to clarify your position before I go back to the client, Twitter "can't" or "it is impossible" to search by e-mail address on your side, or Twitter "won't" do that, for whatever reason you might want to articulate an objection to doing so.

Thanks,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 20, 2023 11:06 AM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Dave, we need a subpoena for a specific account identified by URL or username. We can't use one account to search out for others.

**J Jonathan Hawk** | Partner
**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com
White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 20, 2023 8:36 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

You can't search by the email address of the user?

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com

masuda funai

CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 20, 2023 10:34:33 AM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Thanks, Dave. As discussed in our first VC we can't do that. We need specific URLs or usernames to identify accounts. If there are other accounts that could be subject to a new subpoena, we can consider that.

Jon


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 20, 2023 8:24 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi Jon,

Thanks for making the initial production, which we've received and reviewed. The client has asked that I reach out and inquire whether Twitter will respond to request No 4 of the subpoena, which asks for any other accounts registered to the individuals that registered the imposter accounts.

Can you please advise Twitter's position on this.

Thanks,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



**CHICAGO** | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** David J. Stein
**Sent:** Thursday, April 13, 2023 1:47 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi Jon,

Following-up on our conversation earlier this week, I can confirm again, as we've stated before, that the subpoena is not seeking any information related to influencer Twitter accounts, as I've repeatedly reiterated to you. Rather, as we discussed, the subpoena only seeks information related to the Imposter Twitter accounts, as defined in the subpoena.

Additionally, I've reviewed Count XII and the other portions of the Complaint that you reference below, and at this time we are not seeking any information related to influencer accounts. Rather, as we discussed, the subpoena is as you described it, a "straightforward DMCA request for BSI."

The client has instructed that if we do not get compliance with the subpoena at this time, that we should move forward with an ancillary proceeding in ND California to enforce. Please advise Twitter's position as soon as possible.

Regards,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



**CHICAGO** | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 6, 2023 1:56 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Thanks, Dave.

**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 6, 2023 11:54 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Yes, that works, I'll send an invite. Thanks.

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 6, 2023 12:41 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

9:30 am Pacific work?

**J Jonathan Hawk** | Partner

**T** +1 213 620 7741    **M** +1 626 755 1400    **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 6, 2023 10:38 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Ok, can you give me a time so that we can put an invite on the calendar and quit missing each other?

Thanks

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 6, 2023 12:36:15 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Let's do next Tuesday. I'm jammed on calls tomorrow morning.


**J Jonathan Hawk** | Partner


**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, April 6, 2023 10:34 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

I'm going to be out tomorrow, afternoon for holiday weekend, either morning tomorrow or next Tuesday, as I have a summary judgment argument on Monday.

Thanks,
Dave

**David J. Stein** | Attorney at Law
MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, April 6, 2023 12:24:00 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

David – sorry. I missed this over the weekend. Would 2 pm tomorrow Pacific work?


**J Jonathan Hawk** | Partner


**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Sunday, April 2, 2023 1:41 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

How is 10:00 am your time?

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Friday, March 31, 2023 3:27 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Sorry to hear that! Monday is great. Good luck!

**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Friday, March 31, 2023 1:25 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

That's odd. Let's shoot for Monday I'm dealing with a sick 3 year old today.

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Friday, March 31, 2023 2:59:37 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Hi, Dave. Sorry we didn't connect yesterday. I called your cell and it just rang. Happy to connect though if / when you're available.

Jon


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 30, 2023 12:08 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Ok, call my cell – we shouldn't need more than 10 mins – if I am on the phone Ill try to get right back to you.

630-564-0274.

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, March 30, 2023 2:06 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Dave, my fire drill is still going – can I call you directly when I can (shouldn't be too long)?


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 30, 2023 10:45 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Sure. I'll adjust the invite.

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, March 30, 2023 12:44 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Dave, apologies. A fire drill just popped up. Can we push to noon pacific?

**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 30, 2023 10:20 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Apologies, thanks for being flexible.

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, March 30, 2023 12:16 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Works for me. Thanks, Dave.


**J Jonathan Hawk** | Partner


**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 30, 2023 10:12 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

Hi Jon,

My apologies, I'm caught on another meeting. Can you push for an hour? (11 am PST?) I'll send an invite.

Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, March 30, 2023 9:46 AM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Works for me. Do you want to circulate a dial-in?


**J Jonathan Hawk** | Partner

**T**  +1 213 620 7741    **M**  +1 626 755 1400    **E**  jhawk@whitecase.com

White & Case LLP  |  555 South Flower Street, Suite 2700  |  Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 30, 2023 6:21 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** Re: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

How is 10:00 your time?

**David J. Stein** | Attorney at Law
MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

**CONFIDENTIALITY:** This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Wednesday, March 29, 2023 12:00:52 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi, Dave. Thanks for this and sorry for the delay. Was traveling. I'm generally free tomorrow morning Pacific if you have time?

**J Jonathan Hawk** | Partner

**T**  +1 213 620 7741    **M**  +1 626 755 1400    **E**  jhawk@whitecase.com

White & Case LLP  |  555 South Flower Street, Suite 2700  |  Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Monday, March 27, 2023 1:54 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi Jon,

Apologies for the slow response here. I was advised to pause our discussions on my side for a short period of time, but have been instructed to reach back out to you.

Do you have time for a 10-15 minute call this week to move the ball forward?

Thanks,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, March 9, 2023 10:06 AM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Thanks, Dave.


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 9, 2023 7:17 AM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi John,

Thanks for your e-mail. Suffice it to say that we reiterate that we don't believe there are any first amendment concerns here. But, I will discuss with the client and get you a more formal response in the next day or two.

Thanks,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com



CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Wednesday, March 8, 2023 10:53 AM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi, Dave and Jiwon.

Thank you again for sending us the Amended Complaint, exhibits, and the Defendants' Motion to Dismiss. We've reviewed them and are hoping you could clarify some questions we have regarding some of the claims in the Complaint.

The Complaint contains a product disparagement and trade libel claim under Illinois common law (Count XII), which alleges that Temu contracted with influencers to publish false and misleading representations of fact that disparaged the quality of Shein goods and Shein's business reputation. It also contains a claim for contributory false advertising under 15 U.S.C §1125 (a) (Count V), which alleges that Temu disseminated influencer statements to third-party influencers who then posted them. It is not clear to us whether your client is claiming that these influencer statements were posted on Twitter, rather than other platforms -- the exhibits appear only to contain Instagram posts relating to these claims. However, we also noticed the language in paragraph 108 of the Complaint that notes that "Moreover, because of difficulty of searching for social media posts and the fact that many internet search engines do not regularly index social media posts, Plaintiff is currently unable to identify additional examples of social media posts reflecting the content of the Influencer Statements without conducting discovery into third parties like Instagram, YouTube, and others."

These claims have the potential to implicate First Amendment concerns under the SCA and are outside of the bounds of a straightforward DMCA subpoena request for BSI. To the extent that your client does intend to claim the influencer statements were posted on Twitter and is requesting that Twitter produce documents in furtherance of those claims, we would definably need to bring that back to our client and evaluate further given the SCA issues at play.

Please let us know, and thanks again.

Jon


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** Hawk, J. Jonathan
**Sent:** Friday, March 3, 2023 11:26 AM
**To:** 'David J. Stein' <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Thanks, Dave! Do you have copies of the exhibits to the amendment complaint you can send across?

Jon


**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

**From:** David J. Stein <DStein@MasudaFunai.com>
**Sent:** Thursday, March 2, 2023 12:27 PM
**To:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>; Jiwon Yhee <JYhee@MasudaFunai.com>
**Subject:** RE: Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119 [MASUDA-ACTIVE.FID450978]

Hi Jon,

Per your request, attached is a copy of the Memorandum in Support of Defendant's Motion to Dismiss and the Amended Complaint filed in Response, which was just submitted yesterday.

Let me know when we can speak next week after you have conferred with Twitter. I have a call with the client on my end tomorrow.

Thanks,
Dave

**David J. Stein** | Attorney at Law
**MASUDA, FUNAI, EIFERT & MITCHELL, LTD.**
TEL 312.245.7474 | FAX 312.245.7467
203 N. LaSalle Street, Suite 2500 | Chicago, IL 60601-1262
DStein@masudafunai.com | www.masudafunai.com

# masuda funai

CHICAGO | LOS ANGELES | SCHAUMBURG

CONFIDENTIALITY: This e-mail and any attachments are confidential and intended only for the designated recipient. Such materials may be subject to the attorney-client privilege or other privilege. If you have received this e-mail in error, please immediately return it to the sender, delete it and destroy any copies. If you have any questions, please call the sender, David J. Stein, at 312.245.7474.

**From:** Hawk, J. Jonathan <jhawk@whitecase.com>
**Sent:** Thursday, February 23, 2023 1:44 PM
**To:** David J. Stein <DStein@MasudaFunai.com>
**Cc:** Kuethman, Kathryn <kathryn.kuethman@whitecase.com>
**Subject:** Roadget Bus. Pte. Ltd. v. Whaleco, Inc., No. 1:22-cv-07119

This email originated outside Masuda Funai Eifert & Mitchell.

Your attachments have been security checked by Mimecast Attachment Protection. Files where no threat or malware was detected are attached.

Counsel,

Please see the attached. A hard copy will follow by mail.

Jon

**J Jonathan Hawk** | Partner

**T** +1 213 620 7741   **M** +1 626 755 1400   **E** jhawk@whitecase.com

White & Case LLP | 555 South Flower Street, Suite 2700 | Los Angeles, CA 90071-2433

# WHITE & CASE

============================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

============================================================================

============================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

============================================================================

============================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

============================================================================

==================================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

==================================================================================

============================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

============================================================================

============================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


============================================================================

============================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


============================================================================

============================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


============================================================================

=============================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


=============================================================================

============================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by

telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

========================================================================

================================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


================================================================================

================================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


================================================================================

========================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


========================================================================

========================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


========================================================================

================================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

===========================================================================

=======================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

=======================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

=======================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

=======================================================================
This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

==========================================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

==========================================================================================

=======================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

=======================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================

=======================================================================

This communication may be privileged and confidential and is intended only for the individual or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also, please notify the sender by replying to this e-mail or by telephone at (213) 620-7700, and then delete the e-mail and any copies of it.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

=======================================================================